In re Larry Lee KOCHER, Judith Ann Kocher, Debtors.

Bankruptcy No. 2-86-04794.

United States Bankruptcy Court, S.D. Ohio, E.D.

June 2, 1987.

Charles W. Ewing, Charles W. Ewing Co., L.P.A., Columbus, Ohio, for debtors.

William B. Logan, Jr., Luper, Wolinetz, Sheriff & Neidenthal, L.P.A., Columbus, Ohio, for The Federal Land Bank of Louisville.

Frank M. Pees, Worthington, Ohio, trustee.

ORDER DENYING FEDERAL LAND BANK OF LOUISVILLE'S MOTION FOR TERMINATION OF THE AUTOMATIC STAY AND/OR FOR ABANDONMENT OF REAL ESTATE AND/OR FOR AN ORDER CONTROLLING THE USE OF THE REAL ESTATE

R.G. COLE, Bankruptcy Judge.

This case arises under 28 U.S.C. § 1334(b) and, having been referred to this

Court, is determined to be a core proceeding under 28 U.S.C. § 157(b)(2)(G). This matter is before the Court upon the Motion for Termination of the Automatic Stay and/or for Abandonment of Real Estate and/or for an Order Controlling the Use of the Real Estate (hereinafter "Relief from Stay Motion") filed by The Federal Land Bank of Louisville ("FLB") and the Memorandum Contra FLB's Relief from Stay Motion filed by the debtors. Following an evidentiary hearing, this matter was taken under advisement by the Court.

## I. Statement of Facts

The testimony and evidence before the Court discloses that the debtors are family farmers who filed their petition for relief under Chapter 12 of the Bankruptcy Code on December 1, 1986. FLB is the holder of a claim in the amount of $409,879.90, secured by a mortgage on debtor's farmland which consists of three parcels totaling approximately 273 acres:

| Parcel | Acreage | Location | Improvements |
|---|---|---|---|
| Tract A | 80 acres | Crawford County/ Whetstone Township | 1½ story farmhouse; garage; barn; and grain bin |
| Tract B | 108.15 acres | Morrow County/ Washington Township | None |
| Tract C | 84.814 acres | Morrow County/ Washington Township | None |

The parties stipulated that Tract C will either be abandoned (pursuant to 11 U.S.C. § 554), or sold (pursuant to 11 U.S.C. § 1206) to FLB, in order to clear liens. Therefore, Tracts A and B, only, are subject to FLB's Relief from Stay Motion. The pertinent agricultural characteristics of Tracts A and B are as follows:

| Parcel | Tillable Acres | Topography | Soil Type |
|---|---|---|---|
| Tract A | 71 | Level | Pewamo–Bennington [1] |
| Tract B | 103 | Level to gently rolling | Bennington-Centerburg [2] |

Both FLB and debtors introduced evidence from their expert and lay witnesses regarding the issue of the fair rental value of Tracts A and B. FLB presented the testimony of Jeffrey A. Easterday ("Easterday"), an attorney and appraiser. Easterday stated his opinion that $70 per acre and $60 per acre constituted the fair rental values for Tracts A and B, respectively. Easterday's opinion of the fair rental values for Tracts A and B was based upon his physical inspection of each parcel of property (with the exception of the interior of the farmhouse situated on Tract A), research of comparable sales and rentals in the area, topography, drainage and soil type, and the corn/wheat bases established for each tract by the Agricultural Stabilization and Conservation Service ("ASCS").[3]

**1.** Both Pewamo and Bennington soils, composed primarily of clay and silt, were described by Easterday as "very productive" and, hence, are regarded as "desirable."

**2.** Centerburg soil was described as a clay-based soil which is less productive than Pewamo and Bennington.

**3.** The acreage base established by the ASCS for a parcel of farmland, which is based upon historical production on such farmland, fixes the

Easterday also stated that the fair rental values for the farmhouse and grain bin, both of which are located on Tract A, are $3,000 per year ($250 per month) and $1,000 per year, respectively.

Easterday further testified that the method of making rental payments proposed by the debtors—paying one-half immediately, with the remaining one-half to be paid by November 15, 1987—would alter his original appraisal of fair rental value. It was Easterday's opinion that if debtors' proposed method of making rental payments were accepted, then an additional $5 per acre should be added to the rental values of Tracts A and B due to the risk of default inherent in this mode of payment, as well as a necessary adjustment factor for the time value of money.[4] Finally, Easterday testified that, based upon his knowledge of recent trends in the Morrow/Crawford County area, he projected that the fair market value of Tracts A and B would decline by 10% during 1987.

The testimony of the debtor, Larry Kocher, and his son, Mike Kocher, who will conduct most of the actual farming operations for the debtors, was also received. The relevant facts elicited from the testimony of Larry Kocher and Mike Kocher are enumerated below:

(1) The debtors' crop plan for the 1987 season calls for the planting of 39 acres of corn on Tracts A and B with 21 acres to be diverted. Soybeans shall be planted on the remainder of Tracts A and B;

(2) The debtors will receive $13,000 in ASCS diversion payments attributable to the 1987 season with 40%, or $5,200, to be received in the spring and the balance to be received in the late fall or early winter (possibly in early 1988);

(3) Approximately $6,000–$7,000 must be expended in order to plant the 1987 corn crop and an additional $14,000 will be needed for the planting of the soybean crop;

(4) A production lien will be granted by the debtors upon their 1987 crop in favor of their suppliers of seed, fertilizer and chemicals;

(5) Debtors Larry and Judith Kocher both receive income from nonfarm-related sources and will continue to receive such income throughout 1987. Larry Kocher operates a small mechanic shop where he performs mechanical repairs on a part-time basis. Judith Kocher works as a part-time secretary;

(6) Debtors have obtained federal crop insurance for their 1987 crop. This insurance will protect the debtors against losses caused by weather or infestation;

(7) The debtor's son, Mike Kocher, rented Tracts A and B from the debtors in 1985 for a rental of $80 per acre. In 1986, Mike Kocher paid $50 per acre rent to the debtors to farm Tracts A, B and C. This $50 per acre rental paid by Mike Kocher in 1986 enabled the debtors to pay the $12,400 in rent which FLB demanded be paid in consideration for its

amount of deficiency payments that the owner of the property will receive from the federal government. The portion of a property that is designated as the acreage base (*e.g.,* corn or wheat base) refers to the number of acres of a particular crop which can be grown upon such property. The ASCS also establishes a fixed number of acres which must be diverted (not planted) upon a given parcel. The total amount of deficiency payments received by a farmer depends upon the number of acres which are diverted or set aside. Further, a direct relationship exists between the acreage base established for a farm property and the ASCS deficiency payments receivable by the owner of that property. For example, an owner of a 100 acre tract of farmland having an eighty (80) acre corn base will receive a much greater deficiency payment from the ASCS than he would receive had a forty (40) acre corn base been established for the same property. There is also a direct relationship between the acreage base established for a property and the property's fair rental value. Thus, the greater the acreage base established for a property, the larger the ASCS deficiency payment received by the landowner, which, in turn, results in the generation of more income from such property than would have been realized had a smaller acreage base been established and a lower ASCS diversion payment received. Accordingly, a property with a high ASCS acreage base can command a larger rental than an identical property with a lower fixed acreage base.

4. Addition of $5 per acre rent to Mr. Easterday's original appraised fair rental values results in the following rental value figures: Tract A—$75 per acre; Tract B—$65 per acre.

agreement to refrain from seeking the appointment of a receiver;

(8) In addition to farming Tracts A and B in 1987, Mike Kocher is also conducting farming operations upon three other 100 acre parcels of farmland that he is renting. The highest rental which Mike Kocher will pay on any of these parcels is $70 per acre. The $70 per acre rental will be paid upon a property with a 100% corn base and upon which the lessor has agreed to operate some of his own machinery. The lowest rental figure which Mike Kocher shall pay in 1987 is $42.50 per acre. This $42.50 per acre rental figure will be paid on a 100 acre parcel of farmland which was described as very similar to Tracts A and B, having a 35–40 acre corn base [5] and slightly more productive soil than Tracts A and B;

(9) The arrangement which Mike Kocher has with the lessors of each of the three 100 acre tracts that he is renting is that he shall pay one-half of the rental before planting and the balance after harvest (no later than November 15, 1987);

(10) During 1987, Larry Kocher shall lease the farmhouse situated on Tract A to his son for a rental of $150 per month. Immediate exterior repair (including painting) of this farmhouse is required to prevent its further deterioration; and

(11) Real property taxes on Tracts A, B and C are in arrears for 1986 and the last half of 1985.

In addition to the testimony of the debtor, Larry Kocher, and his son, Mike Kocher, the debtors also presented the testimony of a real estate appraiser, Emery Miller ("Miller"). Miller, who is a farm consultant and real estate broker, testified that the fair rental value of Tracts A and B is $39.70 per acre. Miller's estimation of fair rental value was derived by applying what he described as an "income approach" to valuation. By ascertaining the total income to be generated by the debtors' farming operation, including payments to be received by the debtors from the federal government under the Acreage Reduction and Paid Land Diversion programs, and subtracting necessary expenses, Miller calculated the total profit that debtors could expect to realize from farming in 1987. Miller then calculated the rental value per acre simply by dividing the debtors' expected net profit from operations for the 1987 crop year by the total acreage of Tracts A and B. Using the aforedescribed income approach, Miller concluded that the fair rental value of the debtors' property is $39.70 per acre.

In closing argument, counsel for the debtors detailed their offer of adequate protection, which may be summarized as follows:

(1) Debtors will pay to FLB $40 per tillable acre as rent for Tracts A and B. One-half of the total rental amount shall be paid immediately, with the remaining one-half to be paid on or before November 15, 1987;

(2) Payment of the second half of the total rental amount shall be secured by an assignment of the ASCS diversion payments which the debtors are to receive in late 1987 or early 1988;

(3) Debtors will pay the real estate taxes on Tracts A and B as they become due; and

(4) Debtors will execute the necessary documents to qualify for CAUV [6] eligibility.

---

5. No testimony was offered to establish the precise crop acreage base that has been established for Tracts A and B. Easterday testified that a 60 acre corn base and a 36½ acre wheat base had been established for Tracts A, B and C; however, Easterday noted that he was unable to determine the corn/wheat bases for Tracts A and B alone. Paul Lensman, Senior Credit Specialist for FLB, testified that the 60 acre corn base established for Tracts A, B and C will be divided between Tracts A and B on a *pro rata* basis by the ASCS. This *pro rata* apportionment between Tracts A, B and C will result in a reduction of the corn base attributable solely to Tracts A and B.

6. Although no testimony was offered to define the term CAUV, apparently the parties were referring to Current Agricultural Use Value as this phrase is defined in Ohio Revised Code § 5713.30. Pursuant to O.R.C. §§ 5713.30 *et seq.*, certain farmland that is devoted exclusively to agricultural use is valued for real property tax purposes at a lower amount than such prop-

FLB argues that debtors' offer of adequate protection is deficient in several respects. First, FLB contends that the payment of $40 per tillable acre is not sufficient to protect FLB's interest from the 10% decline in value which is projected for Tracts A and B during 1987. Second, FLB argues that under 11 U.S.C. § 1205(b)(3), the entire amount of debtors' rental payment must be made in advance, not one-half immediately and one-half by November 15, 1987, as the debtors propose. Finally, FLB asserts that the entire rental for Tracts A and B must be paid "up front" because there is no security being granted to FLB for payment of the second half of the rental payment aside from assignment of ASCS payments which are subject to a production lien granted by debtors to their suppliers of seed, fertilizer and chemicals.

The various issues raised by the parties will be addressed below.

## II. Conclusions of Law

### A. Adequate Protection

The resolution of the issues raised by the parties in the instant case requires an analysis of the concept of adequate protection as it applies to cases filed under recently-enacted Chapter 12 of the Bankruptcy Code. At the outset, the Court notes that § 1205, and not § 361, is determinative of adequate protection in Chapter 12 cases. Section 1205 provides as follows:

(a) Section 361 does not apply in a case under this chapter.

(b) In a case under this chapter, when adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

(3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property; or

(4) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will adequately protect the value of property securing a claim or of such entity's ownership interest in property.

The separate test for adequate protection delineated in § 1205 differs in several material respects from the standard for adequate protection applied under § 361 in Chapter 7, 11 and 13 cases. First, Congress decided to exempt family farmers from the payment of "lost opportunity costs" [7] to their creditors. Congress accomplished this result by eliminating the "indubitable equivalent" requirement from § 1205 and by making it clear that what needs to be protected is the value of the

---

erty's true value in money and is taxed upon this lower agricultural use valuation.

**7.** The Fourth and Ninth Circuits have held that adequate protection requires the debtor to compensate the secured creditor for "lost opportunity costs" in instances where the value of the collateral is less than the amount of the debt secured by the collateral. *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984); *Grundy National Bank v. Tandem Mining Corp.,* 754 F.2d 1436 (4th Cir.1985). Payment of lost opportunity costs requires the periodic disburse-

ment of cash equal to the interest which the undercollateralized secured creditor could earn on an amount of money equivalent to the collateral securing the debt. The rationale underlying the requirement that interest payments for lost opportunity costs be paid as a part of adequate protection is that the automatic stay provisions of the Bankruptcy Code preclude the secured creditor from foreclosing its interest and reinvesting the proceeds. Recovery of lost opportunity costs is premised on the "indubitable equivalent" language of 11 U.S.C. § 361(3).

property and not the value of the creditors' interest in the property.[8] The decision to completely eliminate lost opportunity cost recovery in Chapter 12 cases is based upon Congress' recognition that the payment of lost opportunity costs often posed an insurmountable obstacle to successful farm reorganizations:

> Lost opportunity costs payments present serious barriers to farm reorganizations, because farmland values have dropped so dramatically in many sections of the country—making for many undercollateralized secured lenders. Family farmers are usually unable to pay lost opportunity costs. Thus, family farm reorganizations are often throttled in their infancy upon a motion to lift the automatic stay.

*Joint Explanatory Statement of the Committee of Conference,* 99th Cong. 2d Sess. 132 Cong.Rec. H8999 (daily ed. Oct. 2, 1986). Second, and obviously of greater importance in the present case, § 1205 differs substantially from § 361 in that it adds another means for providing adequate protection where the secured creditor's collateral consists of farmland—paying reasonable market rent.

The central component of debtors' offer of adequate protection in the present case is their offer to pay reasonable market rent—which they contend is no greater than $40 per tillable acre—to FLB pursuant to § 1205(b)(3). FLB contends that the rental offered by the debtors would not adequately protect FLB because the total rental amount which FLB would receive at $40 per tillable acre would be far less than the projected decline in value of Tracts A and B over the next year. Thus, FLB contends that the projected decline in value of Tracts A and B during 1987 will not be offset by debtors' payment of rent at $40 per tillable acre.

FLB's argument may be summarily rejected due to its complete lack of evidentiary support. At hearing, upon the agreement of counsel, the parties chose not to try the issue of valuation—*i.e.,* the fair market value of Tracts A and B. Instead, the evidence adduced by the parties was largely confined to the issue of what constitutes a reasonable rental customary in the community where Tracts A and B are located.[9] Thus, on the record before the Court and absent evidence definitively establishing the fair market value of Tracts A and B,[10] it cannot be determined whether debtors' offer of a $40 per tillable acre rental will, or will not, offset the decline in value (if any)[11] of Tracts A and B during calendar year 1987. However, assuming, *arguendo,* that the values and projections of decline in value contained in the appraisal of FLB's expert witness would ultimately be accepted by the Court, FLB's argument, nevertheless, is fundamentally flawed. As discussed below, § 1205(b)(3) does not require that the decline in value of secured

---

8. *See, Joint Explanatory Statement of the Committee of Conference,* 99th Cong. 2d Sess., 132 Cong.Rec. H8999 (daily ed. Oct. 2, 1986).

9. Presumably, the parties determined that, in the event that they cannot reach an agreement regarding fair market value prior to the confirmation hearing, litigation of the issue of the valuation of Tracts A and B would be postponed until the hearing on confirmation.

10. If the figures set forth in the appraisal of Easterday were accepted, then a total market value of Tracts A and B of $155,000 would be established. Application of the 10% projection of decline in value made by Easterday to this figure results in a total decrease in value for Tracts A and B during 1987 of $15,500. On the other hand, if the values outlined in debtors' Chapter 12 plan were adopted, a $96,700 value would be assigned to Tracts A and B, and,

hence, a resulting $9,670 decline in value figure for 1987 would be set. Under the debtors' proposal, a total rental of $6,960 would be paid to FLB (174 tillable acres × $40 per acre). If Easterday's rental figures are utilized, FLB would receive $16,020 in rent for 1987 (71 tillable acres × $75 per acre; plus 103 tillable acres × $65 per acre; plus a $3,000 rental for the farmhouse and a $1,000 rental for the grain bin located on Tract A).

11. Although Easterday stated his opinion that Tracts A and B would decline in value by 10% during 1987, the basis of this opinion was not clearly delineated. The Court questions whether Easterday's bare, unsupported assertion that Tracts A and B will decline in value by 10% during 1987, standing alone, constitutes competent, probative evidence establishing the actual loss in value which Tracts A and B will suffer this year.

farmland be fully offset by the reasonable and customary rental payments made by the debtors.

Section 1205(b)(3) clearly and unequivocally states that, where a creditor's claim is secured by farmland, the payment by the debtor of a fair rental value constitutes adequate protection *per se*. Put differently, if a creditor's collateral is real estate, the Chapter 12 debtor will in no event need to provide the creditor with more than the fair rental value of the land. The rationale underlying this alternative means of providing adequate protection in Chapter 12 cases was explained by Senator Grassley, the author of this portion of the law, in the following manner:

Allowing the farm-debtor to provide adequate protection by paying rent recognizes the economic realities of foreclosure. During a time of depressed farm values, the lender will usually be the high bidder at a foreclosure sale. If the lender cannot resell the property, it typically will rent the property at the market rate. If the debtor pays market rent while he reorganizes, the lender will be getting only what it would realistically get as a result of a foreclosure. Paying a reasonable rent as a method of protecting secured creditors was permitted during the Depression by the second Frazier–Lemke Act, which survived constitutional challenge in the Supreme Court.

132 Cong.Rec. S3529 (daily ed. March 26, 1986) (Statement of Sen. Grassley).[12]

In sum, the rental payment form of adequate protection sanctioned by § 1205(b)(3) takes into account the economic realities of farm foreclosure. The addition of this alternative form of adequate protection; the elimination of the indubitable equivalent requirement; and, the statement by Congress that the debtor need only protect the value of the property and not the value of the creditors' interest in property, all are

designed to achieve the avowed Congressional purpose of giving family farmers a fighting chance to reorganize their debts and keep their land.[13] To accept the interpretation of § 1205(b)(3) which FLB urges the Court to adopt—that the reasonable rental paid by the debtors must completely offset the decrease in the value of FLB's collateral—would subvert the purpose of Chapter 12 and would stand the legislative history of § 1205 on its head.

■ Having determined that in order to provide FLB with adequate protection the debtors need only make payment of reasonable rent, the Court will now proceed to determine the fair rental value of Tracts A and B. Based upon the totality of the evidence introduced by the parties, the Court concludes that a reasonable rent, that is customary in the community where Tracts A and B are located and, that is based upon the rental value, net income and earning capacity of the property, is $40 per tillable acre.

In evaluating the evidence presented, the Court does not find the $75 and $65 per tillable acre values, assigned by Easterday to Tracts A and B respectively, to be a reliable or persuasive estimation of the present fair rental value of FLB's collateral. Although Easterday's appraisal report (admitted into evidence as Exhibit 5) contains an extensive and detailed analysis of comparable sales in the community where Tracts A and B are located, this appraisal is devoid of any data supporting the calculation of fair rental value for these properties. Further, while Easterday made vague reference to an inquiry into fair rental values in the area, upon cross-examination, Easterday conceded that he had not spoken with anyone who is renting farmland in the general vicinity of Tracts A and B other than FLB. Moreover, Easterday did not inquire as to rental amounts paid for Tracts A and B for the 1986 crop sea-

---

**12.** Senator Grassley's statement was made in introducing the Senate version of Chapter 12, which contained a provision governing adequate protection which was identical to that ultimately enacted by Congress and codified at 11 U.S.C. § 1205.

**13.** *Joint Explanatory Statement of the Committee of Conference*, 99th Cong. 2d Sess., 132 Cong. Rec. H8999 (daily ed. Oct. 2, 1986).

son. Thus, the Court assigns very little weight to the appraisal testimony of Easterday regarding the fair rental value of Tracts A and B.

In arriving at $40 per tillable acre as a reasonable rental figure for Tracts A and B, the Court relies heavily upon what we deem to be perhaps the most credible evidence of fair rental value in the record: the testimony regarding comparable crop rentals paid by Mike Kocher. As noted above, in addition to farming Tracts A and B on behalf of the debtors, Mike Kocher is also conducting farming operations upon three other rented 100 acre tracts of land. Mike Kocher testified that, of the three tracts he is renting for the 1987 crop season, for the parcel most comparable to Tracts A and B in terms of corn base and other relevant agricultural characteristics, he is paying $42.50 per tillable acre. Mike Kocher noted, however, that the tract of land upon which he is paying a $42.50 per tillable acre rental has soil which is superior to that found on Tracts A and B. Hence, with an appropriate downward adjustment of the $42.50 comparable rental figure derived from the testimony of Mike Kocher, due to the slightly inferior soil contained on the Tracts A and B, we conclude that a $40 per tillable acre figure represents a fair and reasonable rental for such properties.

The $40 per tillable acre rental for Tracts A and B arrived at by the Court is further buttressed by the opinion testimony of Miller. Miller opined that $39.70 per tillable acre represented a fair rental figure for Tracts A and B. Plainly, Miller's explanation of the income method of valuation which he employed was less than a model of clarity. However, the Court finds that the income and earning capacity approach to valuation utilized by Miller is explicitly endorsed by § 1205(b)(3) and is reasonably reflective of the fair rental value of Tracts A and B. Accordingly, based upon the comparable rental testimony of Mike Kocher, as substantiated by the expert testimo-

ny of Miller, the Court concludes that the fair rental value of Tracts A and B is $40 per acre.

**B. Mode of Payment**

■ FLB's contention that § 1205 requires that the entire rental amount be paid immediately, as opposed to periodically, also must be considered. FLB interprets § 1205's silence as to the time and/or intervals at which reasonable rental payments must be paid as mandating an immediate lump sum payment by the debtors for the 1987 crop year. Simply put, this Court is unable to find any plausible basis in law or logic for FLB's position. Congress, by introducing a rental concept in Chapter 12 cases to the other more traditional forms of adequate protection, surely must have anticipated that debtors would make rental payments under § 1205(b)(3) on a periodic basis. Indeed, since rent is the quintessential measure of the time value of real property, and because rental payments are almost universally paid at intervals (as opposed to lump-sum payment), it would defy logic to suggest that Congress did not envision that Chapter 12 debtors would make fair rental payments pursuant to § 1205(b)(3) on a periodic basis. It is far more reasonable to assume that § 1205's silence regarding time and mode of payment of rent on farmland is indicative of Congressional intent to leave these questions to the Bankruptcy Court's determination on a case-by-case basis.[14]

■ Finally, the Court notes that it is somewhat puzzled by the fact that the parties devoted a substantial portion of the hearing to litigating the issue of when the final half year's rent should properly be paid to FLB. The debtors argued, on the strength of the testimony of Mike Kocher and Miller, that rent is customarily paid in the farm community as follows: one-half during planting season with the remaining one-half paid after harvest (in no event

---

14. The Court likewise rejects FLB's contention that debtors' obligation to pay future rental payments must be secured in some manner (in this case by assignment of the ASCS diversion payments). Again, FLB reads far too much into

Congressional silence on this matter. It must be presumed that Congress would have included language in § 1205 requiring that security be given for the payment of future rental obligations if it had intended to do so.

later than November 15th). However, as the discussion below indicates, because of the time limitations imposed by Chapter 12, the Court does not believe it necessary to determine how the adequate protection rental payments for the second half of 1987 are to be made.

Unlike the relief provided by Chapter 11, which most farm debtors found to be needlessly complex, unduly time-consuming, inordinately expensive, and normally unworkable, Chapter 12 is closely modeled after Chapter 13. Thus, Chapter 12 cases, like their Chapter 13 counterparts, are designed to proceed at a relatively rapid pace. Section 1221 of the Code provides that a plan be filed in a Chapter 12 case not later than 90 days from the filing of the petition. Further, 11 U.S.C. § 1224 mandates that the hearing on confirmation of a Chapter 12 debtor's plan be *concluded* not later than 45 days from the filing of a plan. Hence, even in those cases in which the debtor chooses to utilize the entire 90–day period afforded by § 1221 before filing a plan, assuming the secured creditor files a relief from stay motion immediately after the order for relief is entered, the period of time during which adequate protection must be provided should not exceed 135 days. Under this statutory framework, the Court simply cannot foresee a situation in which adequate protection rental payments would be paid over a period of a year as the parties herein contemplated.

 Accordingly, because the time period during which adequate protection must be provided is relatively short, the Court holds that the debtors may make reasonable rental payments on a monthly basis. If, due to some unforeseen contingency, such rental payments extend beyond six months, then the debtors shall be permitted to delay the payment for the second half of 1987 until after harvest, or no later than November 15, 1987, as they have proposed. Based upon the uncontroverted testimony of Mike Kocher, the Court finds that this mode of payment is reasonable and customary in the farm community.

## C. Conclusion

To summarize, the Court holds that pursuant to § 1205(b)(3), in order to adequately protect FLB's collateral, the debtors need only pay reasonable rent customary in the community where the collateral is located. The Court finds that adequate protection exists for the use of Tracts A and B during the pendency of the automatic stay under the following proposal:

(1) Debtors will pay to FLB $40 per tillable acre as rent for Tracts A and B. This rental may be paid either on a month-to-month basis or one-half immediately with the remaining one-half to be paid on or before November 15, 1987;

(2) Debtors will pay FLB $200 per month rent for the farmhouse that is located on Tract A and $1000 per year for the grain bin which is also situated thereon. Payment of these amounts shall be made in the manner outlined above in Paragraph (1);

(3) Debtors will pay the real estate taxes on Tracts A and B as such taxes become due; and

(4) Debtors will execute the necessary documents to qualify for CAUV eligibility.

IT IS SO ORDERED.