In re Shirley Ann Sharon
ANDERSON, Debtor.

Bankruptcy No. 87–60452.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary/Lafayette.

April 15, 1988.

Paul Chael, Crown Point, Ind., for debtor.

Edward Chosnek, Lafayette, Ind., for movant Federal Land Bank.

## MEMORANDUM OPINION AND ORDER

KENT LINDQUIST, Chief Judge.

### I

### STATEMENT OF PROCEEDINGS

This Chapter 12 case came on for joint hearing on March 17, 1988 pursuant to Order of Court February 19, 1988, on the following contested matters:

1. Objection by Federal Land Bank of Louisville ("FLB") filed July 14, 1987, to Debtor's Plan of Reorganization filed June 16, 1987.

2. Motion by Debtor filed June 24, 1987 to void lien of FLB pursuant to 11 U.S.C. Sec. 506(d), and the objections thereto filed by FLB on July 14, 1987.

3. Motion for Relief from Stay by FLB filed February 2, 1988.

The Court's Order of February 19, 1988 provided that this hearing would be a valuation hearing pursuant to 11 U.S.C. Sec. 506(a) for the purposes of both determining the amount of FLB's allowed secured claim pursuant to 11 U.S.C. Sec. 1225(a)(5)(B)(ii) for plan confirmation purposes and the extent, if any, that the Debtor may void FLB's lien pursuant to 11 U.S.C. Sec. 506(d).

In addition, the hearing was held for the purposes of determining what adequate protection, if any, the Debtor must pay to FLB pursuant to 11 U.S.C. Sec. 1205 based on FLB's Motion for Stay Relief filed February 2, 1988.

Debtor appears by Attorney Chael.

FLB appears by Attorney Chosnek.

Chapter 12 Trustee Nesbitt appears.

Evidence submitted and arguments heard.

At the outset of the hearing, the Debtor made her oral motion that the value of her property should be determined as of June 9, 1987, inasmuch as the FLB had filed a bad faith Motion to Dismiss the Debtor's case on June 5, 1987 based on a lack of eligibility which was subsequently voluntarily withdrawn by FLB on January 27, 1988 and that this was done to delay the valuation hearing originally set for June 9, 1987 because FLB thought land values were rising and wanted the benefit thereof.

The Debtor's plan was filed on June 16, 1987 and was initially set for confirmation hearing on July 30, 1987, but not heard.

FLB responded that the Motion to Dismiss was in good faith at the time filed and when later case law clarified the situation, FLB in good faith withdrew its Motion. FLB also asserted that value must be determined as of the effective date of the plan pursuant to 11 U.S.C. Sec. 1225.

The Trustee stated that he saw no evidence of bad faith by FLB as the § 341 meeting did raise several bona fide issues of eligibility on the part of the Debtor.

The Court reserved its ruling on the Debtor's Motion.

Trustee Nesbitt also made an oral motion that in light of the recent decision by the Supreme Court in the case of *United Savings Association of Texas v. Timbers of Inwood First Associates, Inc.,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), that held that adequate protection payments in the form of "interest" were not permitted under Sec. 362(d)(1) in a Chapter 11 case that holding should extend to Chapter 12 case notwithstanding 11 U.S.C. Sec. 1205(b)(4). The Court denied this Motion.

II

FINDINGS OF FACT

The Debtor testified that she believed that she owned 383 acres upon which were located a home, an uninsurable barn, a machine shed, and a dilapidated corn crib and milk house. (The Debtor's Summary of Operations stated the total land is 387 acres.) She further related three to four acres around the house were mowed, roads and ditches comprised five acres, and that ten acres were in standing water and not plowed, but that the rest was tillable or approximately 365 acres were tillable. (The Debtor's Summary of Operations states 370 acres are tillable. The Court construes this to mean the acreage around the house is potentially tillable.) The Debtor further testified that the land never drained well, that there was much low ground and peat bog, that some tile had caved in, that farm equipment had become stuck and that standing water had resulted in unspecified amounts of crop damage.

The Debtor, without stating any specific basis for her opinion other than her general knowledge of the farm land in the area surrounding her farm opined that the total value of the subject property was $266,000, *including improvements.* This came to an average of $694.52 an acre based on 383 acres. She added that 85 to 90 acres had a value of only $450 to $500 an acre because it was low ground. The Debtor did not specify the contributory value of the improvements as part of the value per acre. (Assuming 87.5 tillable acres were valued at $475.00 an acre because of low ground, this would leave 282.5 tillable acres valued at $223,438.00 or $794.47 per acre).

The Debtor acknowledged that when she filed her Schedule of Assets in April of 1987, she scheduled this same property with a value of $330,000, *including improvements.* (This would come to an average $861.52 an acre based on 383 acres). The Debtor asserted no appraisal had been done by her at that time and that based on a subsequent appraisal, she now feels that the value originally placed on the property by her was too high.

The Debtor acknowledged that on Form 4835 of her 1986 Federal Income Tax Return (Farm Rental Income and Expenses) she showed a gross farm income of $27,709; $18,564 attributable to her 40% share of crop production and $9,345 to agricultural program payments. (The Debtor's Summary of Operations states that in 1986 121 acres were set aside.) She shares the income from the farm on a 60–40 sharecrop basis:—40% to her and 60% to her brother-in-law. The Debtor verified that her Summary of Operations filed with the Court as to her 1986 crop year was correct, and that in 1986, she jointly farmed 260 acres of corn and 46 acres of soybeans and that the yield therein was 126 bushels per acre for corn or 32,760 bushels at $1.80 per bushel and 40 bushels per acre for soybeans or 1680 bushels at $4.60 a bushel.

The Debtor stated that the 1987 total income for the farm operation was $44,706, and that her 40% share of the net income from crop production after the payment of insurance and taxes and repairs to equipment was $21,000. The Debtor could not remember what she received in deficiency payments in 1987 but they were probably slightly more than made in 1986.

The Debtor next called and qualified as an expert witness in farm land appraisals one Charles Dillon, who stated he had physically inspected the land, checked the Debt-

or's title, reviewed local ASCS records relating to the land as well as soil and topography maps together with aerial photos.

Dillon stated that the appraised value of the real estate as of March 31, 1987 for the Debtor's 384 acres, more or less, was $274,234.40 or $713.63 an acre. The appraisal fixed the land at 384.28 acres or $550 an acre for $211,354 and the improvements at $62,880.40 (This would fix the contributory value of the improvements at $163.63 per acre). He showed 370 acres tillable and fair to good for farming and 14.28 acres non-tillable due to fences, ditches, wet spots, and improvements. Dillon's summary concluded that 370 acres were considered to be "fair to good" for farming, and that approximately 25 acres were subject to crop loss due to drainage or wetness depending on the weather. A summary of his data supporting this original appraisal dated April 10, 1987, was admitted into evidence as Debtor's Exhibit No. 1.

Dillon opined that the value of the land was affected by the fact that it had standing water when observed due to lack of good drainage as to a portion thereof, and the fact that there were two power easements that criss-crossed the property. He asserted that easements always affect the value and might have a negative effect, though he admitted this negative effect could not be quantified, and would not have any measurable impact on the value for farming purposes vis a vis industrial or commercial use. He also admitted that the standing water he observed was after a substantial rain and adjacent property also had standing water at the time.

Dillon fixed the value of the property based solely on the fair market value (comparable sales on market data) approach. He averred that he had trouble in finding comparable sales for the land under the fair market value approach to valuation in that most of the parcels used as comparables were considerably smaller in size. He concluded that large tracts were not selling easily and those that did sell had to be exceptionally high producers at a very attractive price. Dillon asserted that smaller parcels normally bring a higher price as they are easier to sell because of affordability and ease of financing. The comparables used by Dillon made no adjustments for location, size and shape, percent tillable and topography or time of sale. Dillon asserted these factors were too subjective to quantify, and he does not employ adjustments in comparable sales. Dillon did not actually check the quality of the soil of the comparables but just labeled the soil generally, e.g. "sandy soil" or "average" based on sales reports received by him. He did not employ the income approach to value as he felt it was no assistance in fixing value.

Dillon stated he updated his appraisal of March 31, 1987 as of the date of the hearing and stated that the approximate value of the property was now $286,270.00. (This would come to $745.00 an acre for 384 acres, or $773.70 per acre for the 370 tillable acres only). He was of the opinion that the farm land had increased in value 6% since his original appraisal and that the improvements had decreased in value 1% since his first appraisal. (Based on a 100 year life for improvements or 1% per year).

As to the fair rental value of the real estate, Dillon was of the opinion that the Debtor should get at least $70 gross per tillable acre less any normal and customary landlord expenses such as taxes, liability insurance, ditch maintenance and liming. The taxes are $3,491 a year ($2,961.37 attributable to land and $529.85 for improvements) and the Debtor's estimated insurance for 1987 per her summary of operations was $681.00. There was no evidence of any actual expense for ditch maintenance. It was estimated by Dillon that if liming were done every three to five years at $25.00 to $35.00 an acre, the cost would be around $5.00 to $7.00 on an annual basis. Dillon stated that the top rent he would try to obtain for the property would be $85.00 an acre.

FLB called Larry A. Smith of Halderman Farm Management Services, Inc. as its expert appraiser as to the Debtor's property.

Smith testified he had personally inspected the subject property, verified title and acreage by public records, checked ASCS records, reviewed aerial photos, queried lo-

cal owners regarding values, obtained information on comparable sales, and visited those comparable properties personally.

Smith related that the public records reflect that the Debtor owns 383.28 acres while the ASCS office shows 378 tillable acres (which he believes to be correct). According to Smith, the ASCS shows a corn base of 90%, with an assigned yield of 109 acres per bushel.

Smith's examination of the property revealed that the property did have one wet area which resulted in some ponding and retention and that the subject property did appear to drain slower than other properties in the adjacent area.

FLB had admitted into evidence as Plaintiff's Exhibit No. 1 a written summary of the data supporting Smith's original opinion as to value dated May 28, 1987, which also had an effective date of May 28, 1987. Smith noted that the land was comprised of 98% loam and sandy loam soils, which have a tendency to be "droughty" and reflect lower yields in years of lower precipitation, and that the soil also had a few drainage problems with a tendency to pond in periods of long rain. Smith's opinion of the value of 384.28 acres was that it had a fair market value of $890.00 an acre or $342,009.00 based on the market approach. Smith used 9 comparables on the market approach ranging in size from 40 acres to 175 acres. No mathematical adjustments were made by Smith as to these comparables; however as to comparable number 6, which sold for $1,000.00 an acre, Smith noted the land was similar to that of the Debtors as to soil type, percent tillable, and topography, though not nearly as large or as well located. (*See* Plaintiff's Exhibit No. 1, p. 7).

On a cost approach, Smith valued the property at $337,175.00 or $877.00 an acre. The cost approach used by Smith itemized all components of the property and their contributory value as follows:

| Land Contributory | Value |
|---|---|
| 283.5 tillable acres @ $850 | $240,975.00 |
| 94.5 tillable acres @ $500 | 47,250.00 |
| 1.5 acres in buildings and lots @ 1500 | 2,250.00 |
| 4.78 acres roads and waste @ $0 | 0.00 |
| 384.28 acres | $289,425.00 |
| or per acre | $753.00 |

Improvements

| | |
|---|---|
| Two-story frame home | $ 45,000.00 |
| 20' × 24' concrete block garage/storage | 250.00 |
| Machinery Shed | 1,500.00 |
| 38' × 64' concrete block barn | 500.00 |
| Double crib/granary | 500.00 |
| Total | $ 47,750.00 |
| or per acre | $124.00 |

*See*, p. 5 of Plaintiff's Exhibit No. 1.

Smith also valued the land by the income or earnings approach. This was done by calculating the net earning derived from the property and using a capitalization rate of recent sales of Porter County grain farms at 7%. Based on the income analysis, Smith valued the land at $341,928.00 or $889.00 an acre as follows:

Income

| | |
|---|---|
| 378 tillable acres (90% corn base) @ $80/acre | $ 30,240.00 |
| House rental @ $300/month | 3,600.00 |
| Total Income | $ 33,840.00 |

Expenses

| | |
|---|---|
| Lime and Land repair | $ 2,025.00 |
| Building repairs | 2,000.00 |
| Building and liability insurance | 2,300.00 |
| Real Estate Taxes | 3,580.00 |
| Total Expenses | $ 9,905.00 |
| Net Farm Rental Income | $ 23,935.00 |
| Capitalization rate of recent Porter County grain farms @ 7% | |
| Capitalization of farm income | $341,928.00 |
| or per acre | $889.00 |

*See*, page 9 of Plaintiff's Exhibit No. 1.

Smith did an analysis of cash rental rates in the Morgan Township area for 1987 and located the W. Ailes to L. Ailes farm lease consisting of 210.4 acres renting at $90.00 an acre, and the W. Ailes to Markley lease for 243.2 acres renting for $80.00 an acre.

Smith opined that the subject property would have leased at $80.00 an acre in 1987. *See*, p. 11 of Plaintiff's Exhibit No. 1.

Finally, Smith correlated the three appraisals: 1) market data 2) earnings, and 3) cost.

Smith noted that each approach is significant in estimating the market value of the land.

The cost approach represents the market value of the land as unimproved with the contributory value of the buildings in their "as is" condition. The earnings approach indicates the value of the subject property if it would earn the "typical" 7% return on capital under a typical farm lease. Earnings reflect the return on investment. The market data approach reflects the supply and demand for farms and properties of the type of the subject property in the Morgan Township Community.

According to Smith, the three approaches help to reinforce one another and based on the pertinent data, the appraised value of the property was $342,009.00 for 384.28 acres or $890.00 an acre as of May 28, 1987. *See*, p. 10 of Plaintiff's Exhibit No. 1.

Smith stated he also performed an updated written appraisal as of March 15, 1988. A summary of the data upon which that appraisal was based was admitted into evidence as Plaintiff's Exhibit No. 2. Smith affixed a value to the property as of March 15, 1988 as being $393,557.00 or $1,024.00 an acre for 384.23 acres.

Smith noted that since his May 28, 1987 appraisal, two comparable sales were located within two miles of the subject property which has occurred since December, 1987, as well as three sales within five miles, and several sales in the general community in excess of $300,000.00.

Smith also related that as to the May 28, 1987 appraisal there was a falling market and the comparable sales were of early 1987 and most in 1986 and thus, those comparable sales were adjusted as to time. In addition, all comparables used in the earlier appraisal were all 175 acres or less in size.

Smith enumerated five recent comparables that he deemed important in determining the present value of the subject property, all of which were in the immediate locale of the subject property. These were as follows:

| | Sale | Acres | Tillable Acres | Price per Acre | Date |
|---|---|---|---|---|---|
| 1. | Northern Indiana Bank to Broker | 71 | 70 | $1,056.00 | 12/87 |
| 2. | Lang to Barkley | 105 | 100 | $1,000.00 | 01/87 |
| 3. | Stude to Ranck [1] | 80 | 72 | $1,000.00 | No date given |
| 4. | Coperny to Tolliver | 60 | 58 | $ 760.00 | 07/87 |
| 5. | FLB "Deardorff" to Moore [2] | 638 | 467 | $ 595.00 | 05/87 |

*See*, pp. 2–3 of Plaintiff's Exhibit No. 2.

Smith stated that no adjustments were made to these comparables as to size as he could not find that size affected value in the market place today.

Smith also located the following sales of comparable sized farms located within fifteen miles of the subject property in La-Porte County, which is the county contiguous to Porter County to the east.:

| | Sale | Acres | Tillable Acres | Price per Acre | Date |
|---|---|---|---|---|---|
| 1. | Carlson to Seeger | 320 | 300 | $1,150.00 | 09/87 |
| 2. | Groski to Welke | 236 | 230 | $1,175.00 | 10/87 |
| 3. | Prudential to Gunz | 416 | 400 | $ 800.00 | 02/87 |

**1.** The Stude to Ranck Sale was for $181,000.00. Smith allowed $80,000.00 to the improvements.

**2.** 73% of land was tillable and in a flood plains. Per Smith, this farm is quite prone to flooding and crop loss due to poor drainage.

*See,* p. 3 of Plaintiff's Exhibit No. 2.

Smith further modified his original appraisal based on the earnings approach to value based on known 1988 cash rental rates in the community and the current land capitalization rates of recent farmland sales in the area. The revised valuation based on the earnings approach was as follows:

INCOME

| | |
|---|---:|
| 378 tillable acres (90% corn base) @ $85/acre- | $ 32,130.00 |
| house rental @ $300/month | 3,600.00 |
| Total Income | $ 35,730.00 |

EXPENSES

| | |
|---|---:|
| Lime and land repair | $ 2,025.00 |
| Building repairs | 2,000.00 |
| Building and liability insurance estimated 1988 | 2,415.00 |
| Real estate taxes—estimated 1988 | 3,760.00 |
| Total Expenses | $ 10,200.00 |
| Net Farm Rental Income | $ 25,530.00 |
| Capitalization rate of recent Porter County grain farms @ 6.5% | |
| Capitalization of Farm Income | $392,769.00 |
| or per acre | $ 1,022.00 |

*See,* p. 4 of Plaintiff's Exhibit No. 2.

Smith stated he lowered the capitalization rate from 7% to 6.5% because of declining interest rates and the fact that land values have ceased to decline and in fact have been increasing and thus investors are willing to accept a lower cash return in anticipation of an appreciation in land values.

Smith acknowledged that his earning approach is premised on an absentee owner buyer and that an operating farmer buyer would be over-paying for the land as valued, on an earnings approach, but that an operating farmer does not necessarily consider the capitalization rate as does an absentee owner buyer.

The last witness by FLB was Ed Redden, who is a full-time appraiser for the Farm Credit System.

He completed a written appraisal dated October 13, 1987, and concluded that the Debtor's property at that time had a value of $393,000.00, "as is". This was broken down as follows:

| | | |
|---|---|---:|
| 1. | $900.00 an acre for 384.-28 acres (100% tillable) | $345,852.00 |
| 2. | Improvements | $47,000.00 |
| | Total | $393,000.00 |
| | | (Rounded) |

*See,* Plaintiff's Exhibit No. 3, which was admitted into evidence and which summarizes the data supporting Redden's opinion.

Redden said he did not physically inspect the improvements and that the appraisal was a "review" appraisal to "follow up" on other appraisals.

Redden used five comparables. The adjustment factors were 1) location; 2) size/shape; 3) soil/topography; 4) time; and 5) percent tillable.

The comparables used by Redden were all smaller tracts ranging from 41 to 126 acres. However, Redden made no adjustments for size. Redden averred that based on his experience in a ten-county area, of which the subject property is part, he could find no differences in the value of property based on size until a parcel fell below 40 acres, assuming comparable soil type and percentage of the acreage that was tillable.

Redden also did an analysis on the income approach using three different capitalization rates. His computations were as follows:

| | | |
|---|---|---:|
| Total Acres | | 384.28 |
| Tillable Acres | | 378.00 |
| Typical Rent per Tillable Acre | | $75.00 |

INCOME AND EXPENSE DATA

| | |
|---|---:|
| 12 Month Planning Period | |
| Cash Rental Income | $ 28,350.00 |
| Dwelling Rental | 3,000.00 |
| Total Income | . $ 31,350.00 |
| Taxes | $ 3,491.00 |
| Insurance | 522.00 |
| Maintenance Expense | $ 2,350.00 |
| Total Expense | $ 6,363.00 |
| Expected Net Income | $ 24,987.00 |

| Calculations: | | |
|---|---|---:|
| Divide Expected Net Income By Capitalization Rate Equals Capitalization Value | 6% | $416,450.00 |
| | 8% | $312,337.00 |
| | 10% | $249,870.00 |

*See,* p. 3 of Plaintiff's Exhibit No. 3.

Redden also had an opinion as to any changes in the value of the property since the October 13, 1987 appraisal. A summary of the data supporting his opinion was admitted into evidence as Plaintiff's Exhibit No. 4.

He stated that he had uncovered 19 sales since January 1, 1987 in a 10 mile radius of the subject property that ranged in size from 40 to 602 acres with an average adjusted sales price of $1,031.00 per acre. He was of the opinion that after making adjustments for soil types and percentage of tillable acres, was that the present value of the Debtor's property was $431,000.00. Redden again asserted that no adjustments were made in size to the comparables as there did not appear to be any adjustments in market price if the parcel exceeded 40 acres.

As to the earnings approach, Redden stated that the actual capitalization rates on the comparable farms that were sold ranged from 6.9% to 9.0%, and that the average capitalization rate was 7.5%.

Redden was also of the opinion that the gross cash rental rate per acre that could now be received for the property was $80.00 to $85.00 an acre.

### III

### CONCLUSIONS OF LAW AND DISCUSSION

The Court will first address the issue of what point in time should be used to determine the value of the Debtor's property.

■ The Court has reviewed the Motion to Dismiss this case filed by FLB on June 5, 1987 and the transcript of the Debtor's § 341 hearing, and agrees with Trustee Nesbitt that there is no evidence as asserted by the Debtor that FLB filed this motion in bad faith to protract the final valuation hearing as to the Debtor's property because FLB thought it would eventually benefit from a trend of increasing prices for farm land.

The proper date to determine value of the collateral is the date of the valuation hearing since, as a practical matter, confirmation will almost always follow within a brief time after the hearing. *In Re Klein,* 10 B.R. 657 (Bankr.E.D.N.Y.1981) *citing, In Re Jones,* 5 B.R. 736 (Bankr.E.D.Va. 1980) (holding valuation should be on date proceedings calling for value of specific collateral are initiated); *In Re Wabash Valley Power Ass'n, Inc.,* 77 B.R. 991, 1005 (Bankr.S.D.Inc.1987); *In re Busone,* 71 B.R. 201 (Bankr.E.D.N.Y.1987). *See,* 5 Collier on Bankruptcy, para. 1325.-06(4)(b)(iii)(A), p. 1325–36 where it is noted that the value of property to be distributed under the plan is to be ascertained as of the effective date of the plan (construing 11 U.S.C. § 1325(a)(5)(B)(ii)), and that as a practical matter, the court will in fact ascertain present value as of the date of the hearing on confirmation held under § 1324. *See also, Id.* at para. 1325.-06(4)(b)(1), p. 1325–34 which states that *effective date of the plan* will ordinarily be provided for by the plan and may be the date as of which the order confirming a Chapter 13 plan becomes final. However, the court will normally determine present value as of the date of the confirmation hearing since, as a practical matter, confirmation will almost always follow within a brief time after the issues under § 1325(a)(5)(B)(ii) are resolved.

There is no legislative history of any consequence to enlighten the court if Congress had any intention as to when value is to be determined in a Chapter 12 case pursuant to the foregoing provisions. It is noted however that § 1225(a)(5) is identical to § 1325(a)(5) that was in effect prior to the passage of § 1225(a)(5). In fact Chapter 12 is basically modeled after Chapter 13. Neither the legislative history or the Code defines what is the "effective date of the plan" for valuation purposes. Thus, Chapter 13 case precedents provide a valuable tool for interpretation of Chapter 12 because of the identical language. *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125, 126 (Bank.D.Mont.1987); *In re Beyer,* 72 B.R. 525, 527, n. 1 (Bankr.D.Colo.1987).

It is also noted that the "cramdown" provisions of Chapter 11, § 1129(b)(2)(A)(i) relating to the "fair and equitable" treatment of secured claims includes the following requirements;

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such clams; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, *as of the effective date of the plan,* of at least the value of such holder's interest in the estate's interest in such property; (emphasis added)

This language is substantially similar to and has the same purpose as § 1225(a)(5), and thus the legislative history and the cases interpreting this section may also be helpful to the court in analyzing § 1225(a)(5) as well as those interpreting § 1325(a)(5).

Accordingly, based on the identical language found in § 1325(a)(5) and § 1225(a)(5) as well as the same "as of the effective date of the plan" language found in § 1129(b)(2), the court holds that the value of the Debtor's property shall be determined as of the date of the valuation hearing, or February 19, 1988 for the purposes of § 1225(a)(5). In addition, the Court will use this date for the purposes of valuation pursuant to 11 U.S.C. § 506(d) (lien avoidance) and 11 U.S.C. § 1205 (adequate protection).

The court has previously considered the valuation of farm land in the case of *In Re Snider Farms, Inc.,* Case NO. 87–60512, (J. Lindquist, unpublished Memorandum Opinion and Order, dated October 19, 1987 and Order dated November 10, 1987 denying motion to amend or make additional findings of fact or alter or amend Order of October 19, 1987). There this Court held that when the Debtor is a farmer who is attempting to reorganize as a continuing farm operation rather than as some other type of commercial venture and is not attempting a liquidation of the assets of the estate, the property must be valued for reorganizational and "cram down" purposes as farm land, i.e. its intended use by the Debtor as a part of an on-going farm operation rather than by any valuation or investment standard for non-farm purposes. Accordingly, value for confirmation purposes should not be based upon what a secured creditor might be expected to receive upon realization of its lien on the property by orderly liquidation (not by forced sale) thereof in the open market— possibly to a land speculator or absentee non-farmer investor who might consider non-agricultural factors in placing a higher value on the land because of a "suburban influence" or "urban collar influence" which might impact on the perceived value of the land, i.e., that it might have a possible higher and better use than that of farm land to the purchaser. It must be remembered that § 506(a) provides that the value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the property. Thus, in Chapter 12 cases where property will be held as a going concern for the generation of farm income to pay debts, value should not be based on an orderly liquidation value. *In Re Robinson Ranch, Inc.,* 75 B.R. 606 (Bankr.D.Mont.1987).

This Court also held *In Re Snider Farms, Inc., supra,* that value should be normally determined by the fair market value approach (i.e. the comparable sales or market data approach); however, the income approach is certainly not irrelevant as an ongoing farm operation is dependant on net operating revenues generated as farmland to fund a plan like any other income producing property in reorganization, and thus is clearly one indication of value. Thus, the values revealed by the market

value approach should be at least tested by the income approach when the Debtor, as here, is attempting to reorganize out of operating revenue rather than liquidate in order to insure that the market value as farm land is not unduly influenced by factors that have no bearing on the value of the land as actually used by the Debtor as farmland or a third-party operating farmer as a purchaser as opposed to what a speculator or non-farmer would pay for the property. That is, the value should be based on its actual value as income-producing farmland for confirmation purposes regardless of what its highest and best use might be for other than agricultural purposes outside the context of reorganization. *Id.* pp. 27–29.

The Court has carefully reviewed the appraisals submitted by the respective parties, and is often the case, finds that the appraisers are competent and that appraisals submitted by both sides are substantially credible. However, it is known that appraising is far from an exact science where bona fide differences of professional opinion often exists, and at best these appraisals can only be of some assistance to the Court in fixing values when the parties cannot agree as is the case here, and the Court is certainly not bound by such opinions. In this case, the values submitted by the two parties vary significantly. Although this Court has consistently declined to "split the difference", the value must nevertheless lie somewhere between this spectrum of opinions.

Inasmuch, as the Court has held that the property must be valued as of the date of the valuation hearing, the value attributed to the land by the Debtor's expert witness, was $286,270.00 based solely on the fair market approach. On the other hand Smith valued the property on behalf of the FLB at $393,557.00 on the market value approach and $392,769.00 based on the income approach. Redden on behalf of the FLB valued the property at $431,000.00 and assigned the values based on the income approach or capitalization rates of 6%, 8%, and 10% of $417,133.00, $312,850.00, and $250,280.00 respectively.

The Court rejects the appraisal value as submitted by Dillon on behalf of the Debtor. His supporting data and analysis together with the limited comparable sales, and the failure to actually inspect the comparables and to adjust the comparables for soil type, etc. leads the Court to the conclusion that the fair market value assigned to the property by him is not a true reflection of its value in the market when used as revenue producing farmland as an integral part of an on-going farm operation. This appraisal clearly assigns a value far too low for this land, even assuming some drainage problems, and the existence of the easements.

The Court also rejects the appraised values submitted on behalf of the FLB by Smith. However, the valuations submitted by him were clearly more detailed and in depth, and employed more exact methodology and analysis as to the comparables than that submitted by the Debtor, and thus serve as a more accurate starting point for the Court in making its findings.

In passing, the Court would note that there was no evidence submitted by either side to show that the value of this property was affected in any way by a "suburban influence" or "urban collar" so that the value of the property would have a greater dollar to certain non-farm investors or speculators for possible non-agrarian purposes or solely to benefit from possible appreciation, rather than to an owner-operator or even purchaser who intended to rent the land solely as farmland as an investor.

The Court in testing the market approach with the income approach finds that $80.00 a tillable acre is the present fair market rental rate for the property, assuming there are presently 370 tillable acres out of 384 acres, (This is based on the Debtor's testimony that 365 acres are tillable, which the Court finds credible. However, the acreage around the house must be included or 5 acres added for a total of 370 acres.) The Debtor's summary of operation stated 370 acres were tillable. Using the expenses projected by Smith, together with a capitalization rate of 7.5% (Redden

testified the average capitalization rate was 7.5% on 19 sales since June 1, 1987), rather than 6.5% as proposed by Smith, the Court finds that the value of the property on the income basis is as approximately as follows:

| | |
|---|---|
| Annual Gross Income | |
| $80.00 an acre × 370 tillable acres | $ 29.600.00 |
| $300.00 a mo. for farm house × 12 mos. | $ 3,600.00 |
| TOTAL | $ 33,200.00 |
| Less Expenses (*See* p. —— of opinion, *supra* ) | $ 10,200.00 |
| NET RENTAL INCOME | $ 23,000.00 |
| Capitalization Rate of 7.5% applied to net income | $306,666.67 |
| Per acre based on 384 total acres | $ 808.85 |

The above figure based on the income approach varies significantly with Smith's updated value of $393,557.00 or $1,024.00 an acre as of March 15, 1988.

■ It is clear that based on the income approach, using a modest capitalization rate of 7.5%, the market value of this land exceeds what it would bring if the price were based solely or purely on economic motives and comparing the return on this farm with other investment vehicles, there are clearly at work inducements other than the rate of return. However, the Court cannot find that these factors are necessarily nonagricultural in nature but reflect a willingness by the market to pay a price for farm land in the area for use as farm land in excess of what it can reasonably generate in farm income. Thus, although the Court's own version of the income approach results in a lower value than the fair market approach (comparable sales or market data) provided by Smith, the Court still concludes that the proper starting point to value farmland is the market approach with any necessary adjustments being made for 1) any undue "suburbia or urban collar influence", 2) any excessive disparity between the income approach and the market approach, and 3) any adjustments in location, size/shape, soil/topography, time of sale, and percent of tillable land that the Court perceives the experts did not properly make in arriving at their final value.

In addition to the disparity in the value found by the Court on the income approach vis á vis the market approach the Court does not believe that the Smith appraisal sufficiently takes into consideration four factors. First, the Court believes that economic realities dictate some modest downward adjustments must be made for the size of the parcel even though he and Redden were both of the opinion that size did not effect price if the parcel was over 40 acres in size. Second, there was evidence that the soil and drainage of the subject property is not entirely comparable in quality to other properties in the adjacent area. Third, although the Debtor had yields of 126 bushels per acre for corn and 40 bushels per acre for soybeans in 1986, and apparently had somewhat comparable yields for 1987 (these exact figures were never submitted into evidence), the Debtor has a 90% corn base with an average yield of 109 bushels per acre according to the ASCS records. Thus, over the long term it is unreasonable to assume that the yields generated in 1986 and 1987 will continue to be obtained on a long term basis in future years. The Court takes judicial notice of Indiana Agricultural Statistics of 1986, issued by the USDA and Purdue University and complied by the Indiana Agricultural Statistics Service, which showed that the average yield for corn in Porter County in 1984 was only 108 bushels per acre and 104 bushels per acre for 1985. The Court concludes that while this land is good, average farm land it is not necessarily top-quality farm land that will produce top yields year after year. Fourth, FLB is asserting a 15% increase in the value of the property between May 28, 1987 and March 15, 1988, less than 10 months, or approximately 18% on an annual basis. Such a large increase in such a short time does not appear consistent with the market trends, although the price trend is admittedly upward.

In addition, the Court gives some credence to the Debtor's verified schedule of real property filed at the time of her petition, which set the value of the property at $330,000.00 when this case was filed. If this figure were accepted and there were a 6% increase in value over the last year as testified by Dillon, this would come to $19,000.00, and bring the present value to approximately $350,000.00.

After reviewing ·the evidence and the foregoing factors the Court finds that there are 370 tillable acres of unimproved farm land and 14 acres of waste. The Court further finds that 90 of those tillable acres are of inferior quality and have a value of $550.00 an acre or $49,500.00. There remains 280 acres of average to good farm land which the Court values at $925.00 an acre or $259,000.00. The Court further finds that the value of the improvements is $47,500.00 (contributory value of $123.70 an acre), and that therefore the total value of the 384 acres including improvements is $356,000.00, or $927.00 an acre for 384 acres including the contributory value of the improvements.

■ For the purposes of § 1205, the Court will not include the rental from the farm house or the expenses attributable thereto and other improvements as § 1205 expressly provides the payment of adequate protection for the use of *farmland* based on reasonable rent value.

The net rental value for purposes of § 1205 only is calculated as follows:

Gross Rental Income

| 370 acres @ $80.00 an acre | $29,600.00 |
|---|---|

Rental Expenses

| Real estate taxes (attributable to land only) | $ 2,961.37 |
|---|---|
| Liming ($5.00 an acre) | $ 1,850.00 |
| Estimated Liability Insurance (farmland only—per Debtor's summary) | $ 681.00 |
| Less Total Expenses | $5,492.37 |
| Net Rental Income (Farmland only) | $24,107.63 |

■ Inasmuch as FLB is clearly undersecured as the Debtor in her own motion to void a portion of the FLB lien filed June 24, 1987 admitted to owing FLB approximately $562,343.00, it would seem the Debtor must pay FLB as adequate protection, the sum of $24,107.00 on an annual basis representing the net rental value of the 370 tillable acres of the Debtor based on 11 U.S.C. § 1205. FLB did not file its Motion for Stay Relief until February 2, 1988. That motion merely states that FLB is suffering continuing loss, damage and delay by reason of its inability to foreclose with respect to the real estate. There is no requirement that a Debtor pay adequate protection as a condition to use its own property subject to a lien prior to Court order, other than cash collateral. Thus, on a monthly basis, the first adequate protection payment, if required, would not be due until 30 days from the date of the entry of this Order.

However, it is difficult to perceive how FLB has been prejudiced by the use of the property by the Debtor while FLB has been delayed in from foreclosing on its mortgage by virtue of the automatic stay issued in this case.

FLB's own appraiser, Mr. Smith, stated that the value of the property has increased from $342,009.00 as of May 28, 1987, to $393,557.00 as of March 15, 1988. This is an increase of $51,548.00 or approximately 15% in ten months.

The Debtor's appraiser estimated that the value of the property increased in value $12,036.00 or 4% between March 31, 1987 and March 31, 1988.

Unless waste is committed by the Debtor and there was no evidence whatsoever of this fact, it is clear that the unimproved farm land has not decreased in value while this case has been pending and the stay is in effect.

Section 1205(a) expressly provides that § 361 shall not apply to a Chapter 12 case.

Further, it does not appear that pursuant to 11 U.S.C. § 1205(b) that there is a *per se* requirement that adequate protection be paid in the form of rental payments to an undersecured creditor who has a lien on unimproved farm land. Section 1205(b) states that, *When* adequate protection is required under Sections 362, 363 or 364 of this title of an interest of an entity in property such adequate protection *may* be provided by various means including reasonable rental payments. This means that

there must be a showing that adequate protection must be paid under one of those sections. 11 U.S.C. § 362(d)(1) permits the Court to terminate the stay "for cause" including lack of adequate protection of an interest in property. Pursuant to § 103(a), § 362(d)(1) applies to a case under Chapter 12. It was noted by the Court in *In re Turner*, 82 B.R. 465 (Bankr.W.D.Tenn. 1988) as follows:

> The entire concept of adequate protection is one founded on the requirement that a secured creditor be given some protection from its collateral or property being used and diminished in value. As stated by Collier, the value of a creditor's "secured position as it existed at the commencement of the case is to be protected throughout the case when adequate protection is required." 2 *Collier on Bankruptcy*, para. 362–01 at p. 361–7, (15th Ed.1987). Travelers seems to recognize the fact that adequate protection is a requirement applying "primarily in the context of pre-confirmation proceedings." *In re Monnier Bros.*, 755 F.2d 1336, 1340 (8th Cir.1985); *see also In re Snider Farms, Inc.*, 79 B.R. 801, 808 (Bkrtcy.N.D.Ind.1987). As Debtor's counsel asserted in the hearing on this motion, Section 1205 is intended to provide adequate protection for a limited time between the filing of the Debtors' petition and confirmation of a plan or denial of confirmation. Adequate protection is not a concept that is included in the plan payments, since the Code contemplates that the creditor will receive a value, as of the effective date of the plan, not less than the allowed amount of a secured creditor's claim. 11 U.S.C. Section 1225(a)(5)(B)(ii); *cf. In re Snider Farms, supra.*
>
> The provision in Section 1205(b)(3) of a unique method of adequate protection for Chapter 12 cases in the form of reasonable rents does not automatically mandate that all creditors such as Travelers are entitled to adequate protection payments in this fashion. Rather, the secured creditor is still required to show a necessity for adequate protection, which would include, in this case at least, a showing that the farm property securing Travelers' debt was likely to decrease in value between the time of filing of the Debtors' petition and action by the court on confirmation. Had that showing been made by Travelers, Section 1205(b)(3) appears to provide a *per se* form of adequate protection. That is, the fair rental value is adequate protection without the necessity of the rental fully compensating for a decline in land values. *In re Kocher*, 78 B.R. 844, 16 B.C.D. 558, 562 (Bkrtcy.S.D.Ohio 1987).

\*    \*    \*    \*    \*    \*

Clearly, if Travelers is attempting to obtain rental payments merely as compensation for the loss of use of its collateral during this interval, that request would be in reality a request for lost opportunity cost. Such lost opportunity costs are not allowed in Chapter 12 cases, since Section 1205(a) specifically provides that Section 361 of the Code does not apply to Chapter 12 cases. The exclusion of Section 361 eliminates the "indubitable equivalent" standard of adequate protection. HR Conf.Rep. No. 99–958, 99th Cong.2d Sess. 49–50 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5227, 5250, as reported in *Norton Bankruptcy Code Pamphlet* 1987–1988 Ed. pp. 858–859. The legislative comments to Section 1205 reflect that Congress intended to protect the value of the property involved, not the value of the creditor's interest in that property. The Debtors and creditor here admit that Travelers is undersecured. It has not yet been established as to what extent they are secured. However, to justify adequate protection payments under Section 1205, the creditor must show that the value of the property is suffering. *See* HR Conf.Rep. No. 99–958, 99th Cong.2d Sess. 49–50 (1986), *supra*. The few reported cases on Chapter 12 adequate protection confirm that an undersecured creditor is not entitled to lost opportunity costs. *See, e.g., In re Raylyn Ag., Inc.*, 72 B.R. 523, 524 (Bkrtcy.S.D.Iowa 1987); *In re Rennich*, 70 B.R. 69 (Bkrtcy.D.S.D.1987). The Supreme

Court has upheld the Fifth Circuit in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, — U.S. —, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), holding that interest on collateral during the stay is not allowable to undersecured creditors under Section 362(d)(1). Therefore, lost opportunity costs to undersecured creditors is not permitted.

\* \* \* \* \* \*

Merely because the Debtors propose and intend to continue using the farm land secured to this creditor does not entitle the creditor to automatically recover rent under Section 1205(b)(3). The Court does not read Section 1205(b)(3) to mean that rent is always required.

*Id.* at 468–469.

■ The Court concurs with the analysis of the *Turner* Court and accordingly FLB's right to rental payments is limited to where the property is decreasing in value. The Court had initially denied the trustee's motion to deny adequate protection in a Chapter 12 based on the Supreme Court's recent ruling in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, — U.S. —, 108 S.Ct 626, 98 L.Ed.2d 740 (1988). The Court on its own initiative hereby modifies its ruling and although *Timbers* dealt with a Chapter 11, the analysis in that case is applicable in a Chapter 12 relating to § 362(a)(1).

The Supreme Court clearly held that undersecured creditors are not entitled to compensation under § 362(d)(1) for the delay caused by the automatic stay in foreclosing their collateral;, i.e. that the "interest in property" protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure.

Although § 1205(b)(3) provides authority for this Court to order adequate protection based on the fair rental value of the land, if required, this provision need only be resorted to by the Court if there is an interest in property that must be protected under § 362(d)(1) as defined by *Timbers*. Clearly the "lost opportunity cost" approach adopted by *American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984), and previ-

ously followed by this Court is no longer a valid interest in the Debtor's property that must be adequately protected.

Accordingly, undersecured creditors may now only receive the most common form of adequate protection, payments over time, but only to the extent necessary to protect such creditors from a *decrease in the value* of their collateral during the pendency of the case.

It is also clear from the legislative history of Chapter 12 that § 1205(b)(3) was inserted to eliminate the concept of adequate protection payments for "lost opportunity costs". The Conference Report on § 1205 states as follows:

Section 1205–Adequate Protection

Under current law, the filing of a bankruptcy petition operates as an automatic stay against any act to create, perfect, or enforce an alien against property of the estate. The secured creditor must file a motion to have the stay lifted in order to proceed with foreclosure. The primary basis for lifting the stay is a lack of adequate protection. This term is not defined in the Bankruptcy Code, but examples of adequate protection are set out in 11 U.S.C. 361.

The Fourth and Ninth Circuits have held that adequate protection requires the debtor to compensate the secured creditor for so-called "lost opportunity costs" in those cases where the value of the collateral is less than the amount of debt secured by the collateral. In re *American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984); *Grundy National Bank v. Tandem Mining Corp.*, 754 F.2d 1436 (4th Cir.1985). The payment of lost opportunity costs requires the periodic payment of a sum of cash equal to the interest that the undercollateralized secured creditor might earn on an amount of money equal to the value of the collateral securing the debt.

Lost opportunity costs payments present serious barriers to farm reorganizations, because farmland values have dropped so dramatically in many sections of the country—making for many under-

collateralized secured lenders. Family farmers are usually unable to pay lost opportunity costs. Thus, family farm reorganizations are often throttled in their infancy upon motion to lift the automatic stay.

Accordingly, section 1205 of the conference report provides a separate test for adequate protection in Chapter 12 cases. *It eliminates the need of the family farmer to pay lost opportunity costs,* and adds another means for providing adequate protection for farmland —paying reasonable market rent. Section 1205 eliminates the "indubitable equivalent" language of 11 U.S.C. 361(3) and makes it clear that *what needs to be protected is the value of property, not the value of the creditor's "interest" in property.*

It is expected that this provision will reduce unnecessary litigation during the term of the automatic stay, and will allow the family farmer to devote proper attention to plan preparation. (HR Conf Rep. No. 99–958, 99th Cong., 2d Sess. 49–50 (1986), *reprinted* in *Norton Bankruptcy Law and Practice Bankruptcy Code,* pp. 858–859 (Callaghan 1987–1988 Ed.) (Emphasis supplied).

Thus, based both on the legislative history of § 1205, and the holding in *Timbers,* the Court is restrained from ordering adequate protection for "lost opportunity costs", and is limited to awarding adequate protection to those cases where the property itself is decreasing in value.

Smith testified that farm land on an average increased 11% from January 1, 1987 to January 1, 1988 pursuant to Federal Reserve Board Statistics. No distinction was made as to the percentage increase based on the quality, size, etc. of the land.

Dillon stated that farm land had increased around 6% on an average in the last year.

It appears that an annual increase of approximately 8% is indicative of the upward trend.

Inasmuch as the property has increased in value in the past and there is every indication that the property shall increase in value in at least the near term, the Court finds that no adequate protection payments need be made in the form of net rental payments at this time. It is therefore,

ORDERED, ADJUDGED and DECREED, that the value of the Debtors' property for plan confirmation purposes pursuant to 11 U.S.C. § 1225 and for lien avoidance purposes pursuant to 11 U.S.C. § 506(d) is $356,000.00. And it is further

ORDERED, ADJUDGED and DECREED, that FLB has no right to adequate protection payments for the use of the unimproved farm land at this time; provided, however, the order is without prejudice to FLB renewing its motion at a later date on this issue.