In re Irwin W. ENGLE, Grace E. Engle, jointly and individually, t/a Bannerview Farms.

Civ. A. No. 87–4135.

United States District Court, E.D. Pennsylvania.

Dec. 30, 1987.

Mark G. Yoder, Reading, Pa., for Meridian Bank.

Dale E. Lapp, Lancaster, Pa., for trustee James R. Leonard, Jr.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

### I. INTRODUCTION

Both Meridian Bank (the "bank") and the Trustee have appealed from an order of the bankruptcy court entered on May 20, 1987 in which the bankruptcy judge ruled that the bank was entitled, as a perfected secured creditor, to the proceeds of an auction of farm equipment and livestock in the above-captioned bankruptcy case. The bankruptcy judge denied the bank's motion for turnover of funds which had been placed in an escrow account pursuant to a stipulation for adequate protection reached between the debtors and the bank during the bankruptcy case, 73 B.R. 870. With regard to the auction proceeds, the case turns on whether the bank had a perfected security interest in the items auctioned at the time of the auction. As for the escrow fund, the question presented is whether the bankruptcy court retains the power to consider and approve the propriety of cash payments made as adequate protection during the operation of the stay despite the fact that the creditor has since sought and obtained relief from the stay.

### II. FACTUAL BACKGROUND

This case was commenced as a Chapter 11 farm bankruptcy in November of 1983. The debtors, Irwin and Grace Engle, operated their dairy farm in Lancaster, Pennsylvania until November of 1985, when their real estate was sold at auction and the case was converted to Chapter 7. The debtors' equipment and livestock were sold at separate auctions.

During the course of the attempted reorganization, an agreement was reached between the debtors and the bank requiring the debtors to pay $8,000 per month to the bank as a form of adequate protection in return for which the bank agreed to refrain from foreclosure so that the debtors could continue in business. Although the agreement was never court approved, payments were made pursuant to the agreement resulting in an escrow fund in excess of $100,000. The payments were made over a period of approximately one year at the conclusion of which the bank decided to seek relief from the stay due to the debtor's lack of progress toward successful reorganization.

The security agreement at issue, executed in March of 1975, was intended to secure a loan of $300,000 extended by the bank to the debtors. The agreement identified the collateral as:

> the following described property, together with all equipment, parts, accessories, attachments, additions, and other goods, and replacements thereof, now or hereafter installed in, affixed to or used in connection with said property.

The livestock was described as "113 cows and 48 heifers as identified on the enclosed list of barn numbers, ear tag numbers, and/or registration numbers." The "enclosed list" referred to in the security agreement was not attached or enclosed and was not produced at the hearing below. Apparently, no such list was ever created. The bank has proceeded on the theory that the "replacements" language in the security agreement gave rise to a security interest in after-acquired livestock and equipment.

### III. DISCUSSION

#### A. *The After–Acquired Property Motions*

█ As a threshold matter, the Trustee argues that the security agreement at issue did not contain an after-acquired property provision nor was it intended to cover after-acquired property. I agree and,

therefore, I need not reach the question of the sufficiency of the financing statement.[1]

■ The burden of proving that an item of property is subject to a security interest is on the party asserting the interest. *See United States v. Mid–State Sales Co.*, 336 F.Supp. 1099 (D.Neb.1971). According to the Pennsylvania version of the Uniform Commercial Code, § 9203 provides that a security interest is not enforceable against the debtor or third parties unless "the debtor has signed a security agreement which contains a description of the collateral...." *See* 13 Pa.Cons.Stat.Ann. § 9203 (Purdon 1984). Regarding the description of collateral, § 9110 provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." 13 Pa.Cons.Stat. § 9110 (Purdon 1984). The liberal approach to specificity in description adopted under the Code was a reaction to the difficulties caused by the common law requirement of a detailed description of collateral. *See* 13 Pa.Cons. Stat.Ann. § 9110, comment 1 (Purdon 1984) (discussing rejection of the "serial number" test found in prior decisions). Under the Code, a description is sufficient if it reasonably facilitates identification of the intended collateral.

Despite this liberal approach, the Court of Appeals for the Third Circuit has adopted a more exacting standard of specificity with respect to the designation of after-acquired property interests in security agreements. *See In re Middle Atlantic Stud Welding Co.*, 503 F.2d 1133 (3d Cir. 1974). In *Middle Atlantic*, the court of appeals unequivocally rejected the practice of implying an interest in after-acquired

property from ambiguous language in a security agreement. The court stated:

[I]t is neither onerous nor unreasonable to require a security agreement to make clear its intended collateral. This position does not require the most detailed description possible, but only a clear designation of any class of items intended to be collateral.... A requirement that inclusion of after-acquired [property] be unambiguously expressed will not significantly conflict with any important Code policies and will support some. It will produce simpler, clearer and more certain law for all parties.... The validity of after-acquired property clauses is recognized. Only the implication of such a clause through ambiguous language is rejected.

*Id.* at 1136.

The bank argues that the "replacements" language in the security agreement created an after-acquired property interest to the extent of 113 cows and 48 heifers. The bankruptcy judge apparently agreed, although his opinion focused almost exclusively on the adequacy of the financing statement.[2] In my view, the "replacements" language in the security agreement is, at best, ambiguous and, therefore, I will reverse the decision of the bankruptcy judge to the extent that an interest in after-acquired property was found.

The security agreement at issue created an interest in certain described property "together with all equipment, parts, accessories, attachments, additions and other goods, *and all replacements thereof,* now or hereafter installed in, affixed to or used in connection with said property." The quoted language, part of the printed form used by the parties, is simply an accessions

---

**1.** The question whether a financing statement is sufficient to provide notice of a security interest arises only where the security interest itself is found to arise from the security agreement. An interest in after-acquired property cannot arise from a financing statement—it must arise from the security agreement itself. *See In re Permian Anchor Services, Inc.*, 649 F.2d 763 (10th Cir. 1981).

**2.** The bankruptcy judge purported to engage in a "reexamination" of the *Middle Atlantic* deci-

sion. *See In re Engle*, 73 B.R. 870, 872 (Bankr. E.D.Pa.1987). It is unclear, however, whether the judge in fact considered the *Middle Atlantic* holding regarding the specificity required in security agreements. It appears that the bankruptcy judge may have read *Middle Atlantic* as being inapplicable, in light of the fact that the *Middle Atlantic* decision focused on the sufficiency of the security agreement and the bankruptcy judge was focused on the financing statement.

clause. The "replacements" language grants a security interest in replacements of accessions. To pluck the "replacements" language from the accessions clause and to read it independently as creating an interest in after-acquired goods requires a tortured semantic analysis. The language at issue must be read in its context. The decision of the bankruptcy judge is reversed to the extent that an interest in after-acquired property was recognized. Judgment should be entered in favor of the bank for $9,155, the value of the auctioned equipment that was specifically referred to in the security agreement.

## B. *The Escrow Fund*

■ Under the bankruptcy code, "adequate protection" is a form of relief afforded to creditors whose interest in the debtor's property is such that the passage of time or continuation of the debtor's business could cause prejudice to the creditor. Adequate protection is provided as an alternative to relief from the automatic stay and, conversely, relief from the automatic stay can be justified under § 362(d) where "lack of adequate protection" is proved. 11 U.S.C. § 362(d) (Supp.1987). In short, adequate protection is a method by which a creditor can be compensated for forgoing resort to foreclosure by seeking relief from the stay.

The bank argues that the escrow payments made pursuant to the agreement were valid adequate protection payments. According to the bank, they are entitled to the escrow fund because they agreed to take the payments as adequate protection in lieu of foreclosure in August of 1984 and, in fact, did refrain from seeking foreclosure until August of 1985. The fact that they sought relief from the stay in August of 1985 should not, according to the bank, extinguish their previously existing entitlement to adequate protection from August of 1984 to August of 1985.

The Trustee does not dispute the escrow payments *could have been* made lawfully under the rubric of adequate protection. The Trustee argues, however, and the bankruptcy judge agreed, that the escrow payments cannot now be considered adequate protection payments because they were never court approved.[3] According to the Trustee, after the stay was lifted in August of 1985, any right to adequate protection that may have existed during the previous year no longer survived because relief from the stay obviated the need for and the right to adequate protection.

The use of periodic cash payments as a method of providing adequate protection is well accepted in the decisions construing § 361. *See In re Briggs Transportation Co.*, 780 F.2d 1339 (8th Cir.1985); *Grundy National Bank v. Tandem Mining Co.*, 754 F.2d 1436 (4th Cir.1985); *In re American Mariner Industries*, 734 F.2d 426 (9th Cir.1984). The stipulation for adequate protection reached by the parties here contemplated such payments and, in fact, payments were made by the debtors in accordance with the stipulation. During the time that payments were being made, the bank, as a secured creditor whose collateral was decreasing in value due to a soft real estate market, enjoyed a right to adequate protec-

---

**3.** Under § 549 of the bankruptcy code, the Trustee may avoid post-petition transfers of property of the estate where such transfers are "not authorized under this title or by the court." 11 U.S.C.A. § 549(a)(2)(B) (Supp.1987). An interesting question arises whether adequate protection payments made post-petition require court approval or are "authorized under this title" by §§ 361 and 362(d). The official comments to § 362 suggest that court involvement in adequate protection arrangements should be minimal. In fact, the comments suggest that court involvement should be limited to cases where the adequate protection negotiations fail and the creditor seeks relief from the stay under § 362. The comment states:

This section specifies means by which adequate protection may be provided but, to avoid placing the court in an administrative role, does not require the court to provide it. Instead, the trustee or debtor in possession or the creditor will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate.

11 U.S.C.A. § 361, comment 1 (1979). I need not decide whether court approval is required by statute in all cases, however, because the stipulation at issue here required court approval as a condition.

tion under the Code or, alternatively, a right to seek relief from the stay.

It is true that the bank's right to adequate protection could not have continued after the stay was lifted. This is so simply because adequate protection exists only as an alternative to relief from the stay and, therefore, cannot possibly survive the lifting of the stay. It does not follow, however, that relief from the stay *retroactively* extinguishes a right to adequate protection that existed prior to the lifting of the stay. So long as the adequate protection payments sought arise from an agreement entered during the period that the stay was in effect, and so long as the fund represents compensation for a period when the creditor actually refrained from seeking relief from the stay, I hold that court approval of the transfer of funds may be entered in response to a motion made after the stay has been lifted.

Because the bankruptcy judge held that relief from the stay automatically precluded retroactive ratification of the escrow payments, he did not reach the question whether the payments were proper under standard principles of adequate protection. I will, therefore, reverse the decision of the bankruptcy judge with respect to the escrow fund and remand the case for reconsideration of the belated request for court approval in light of my holding that the bankruptcy judge is free to enter its approval despite the lifting of the stay. In so doing, I leave the ultimate decision on the propriety of an award of adequate protection to the sound discretion of the bankruptcy judge, who should be guided on remand by all proper considerations, including any prejudice the bank may have suffered by foregoing relief from the stay in reliance on the stipulation.