In re Earl L. BRACE and Martha J. Brace, Debtors.

Earl L. BRACE and Martha J. Brace, Movants,

v.

UNITED STATES of America, FARMERS HOME ADMINISTRATION; Meadville Farm Credit, ACA; and Gary J. Gaertner, Esq., Chapter 12 Trustee, Respondents.

Bankruptcy No. 92–10693.
Motion No. GVS–2.

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 25, 1994.

Gary V. Skiba, Erie, PA, for debtors.

Gary J. Gaertner, Pittsburgh, PA, Chapter 13 Trustee.

Michele O. Gutzmer, Pittsburgh, PA, for Farmers Home Admin.

*OPINION*[1]

WARREN W. BENTZ, Chief Judge.

*Introduction*

On August 21, 1992 ("Filing Date"), Earl L. Brace and Martha J. Brace ("Debtors") filed a voluntary Petition under Chapter 12 of the Bankruptcy Code. Before the Court is the Debtors' Motion for Determination of Secured Status. The Farmers Home Administration ("FmHA") has filed a Proof of Claim which asserts a secured claim in the amount of $707,195.73. The Debtors assert that FmHA is a creditor in the amount of $650,588.79 and that Meadville Farm Credit, ACA ("Farm Credit") is a creditor in the amount of $85,385[2]. The Debtors assert that the value of the real estate and equipment upon which the FmHA has a mortgage or security interest is $249,319.31[3] and that the FmHA has a secured claim to that extent and an unsecured claim as to the balance. The Debtors assert that the FmHA's security interest in equipment does not extend to after-acquired property and is therefore limited to property which the Debtors owned in 1978. The Debtors assert that Farm Credit holds a security interest in the after-acquired property and that Farm Credit's secured claim is likewise limited to the value of its collateral.

---

**1.** This Opinion constitutes this Court's findings of fact and conclusions of law.

**2.** We note the discrepancy between the FmHA claim amount of $707,195.73 and the amount of $650,588.79 which the Debtors assert is owed. The total amount of the claims of the FmHA and Farm Credit is not before us. We limit our determination to the secured amount of the claims.

**3.** Following the trial, the Debtor asserts that the total value of collateral, including after-acquired property, is $278,134. *See infra*, p. 276.

FmHA asserts that the value of its collateral is $419,014.10; that the Debtors incorrectly subtracted costs of sale from the value of the collateral; that the Debtors have incorrectly failed to include the value of crops fed to cattle; and that the Debtors have incorrectly deducted repairs and maintenance expense not specifically associated with maintaining, harvesting and marketing the crops; and that its security interest extends to after-acquired property.

The Debtors further assert that the FmHA's appraisal of the Debtors' residence was inappropriate. The FmHA did not base the value upon the use of the residence as a working farm, i.e., the Debtors' current and prospective use, but rather upon its being used as a residence or "hobby farm" for a professional person. The Debtors assert that value must be based on their current and prospective use.

An evidentiary hearing was held on August 18, 1993, following which the parties filed post-hearing memoranda and additional affidavits. The matter is now ripe for decision.

*Summary of Asserted Values*

Both the Debtors and the FmHA presented expert testimony on valuation. Each party submitted post-hearing memoranda following the conclusion of the evidentiary hearing. Summarized below are the values which each party asserts was proven:

| Property Description | FmHA's Position | Debtors' Position |
|---|---|---|
| Debtors' residence and associated farm land ("Parcel 1") | $150,000 | $120,000 |
| Less costs of sale | | 12,000 |
| | | $108,000 |
| Other farm land ("Parcel 2") | $129,000 | $110,000 |
| Less costs of sale | | 11,000 |
| | | $ 99,000 |
| Gravel pit | $ 18,000 | $ 16,000 |
| Less first mortgage lien | 12,253 | 12,253 |
| Less costs of sale | | 1,600 |
| Equity available for FmHA | $ 5,747 | $ 2,147 |
| Equipment | $101,800 | $ 85,327 |
| Titled vehicles on which the FmHA does not have a lien | | 20,715 |
| | | $ 64,612 |
| First lien of Ford Motor Credit on NH combine | | 8,786 |
| | | $ 55,826 |
| Less sales commission | | 4,466 |
| Equity available for FmHA | | $51,360* |
| Cattle | $ 13,900 | $ 10,300 |
| Less sales commission | | 824 |
| | | $ 9,476 |
| Crops and farm product and supplies | $ 18,567 | $ 8,860 |
| Less sales commission | | 709 |
| | | $ 8,151 |
| Value of FmHA's collateral | $419,014 | $278,134 |

* This figure does not include any reduction for after-acquired property. The Debtors believe that "there would be no great implication as to whether the [FmHA's] security interest extends to after-acquired equipment and other collateral or not. If FmHA would not have a lien in after-acquired property, then the security interest would simply fall to [Meadville Farm Credit, ACA]." *Movant's Post–Hearing Memorandum*, p. 8.

*Issues*

1. Whether valuation of the Debtors' real estate should be based upon (a) the Debtors' current and prospective use of the property or (b) the highest and best use of the property?

2. Whether the Debtors may deduct hypothetical costs of sale in arriving at the value of the secured lender's collateral?

3. Whether the language of the FmHA's security agreements and financing statements is sufficient to secure an interest in after-acquired property?

4. Whether the FmHA has a lien on titled vehicles where there is no notation of lien on the title?

5. Whether the amount of the FmHA secured claim should include the value of crops used as feed for cattle which are subject to the same lien?

6. Whether the costs incurred by the Debtors for repairs and maintenance of equipment may be deducted from the value of FmHA's security interest attributable to crops?

7. To what extent are the claims of the FmHA and Farm Credit secured?

*Discussion*

*I. Standard for Valuation*

Frances L. Blanchard ("Blanchard"), the expert appraiser who testified on behalf of the FmHA, based his appraisal of the Debtors' residence and the 92 acres of land on which the Debtors' residence is located ("Parcel 1") upon its being used as a residence in the country for a professional person for use as a hobby farm—where a person might be interested in, for example, keeping a few horses for leisure, rather than upon the Debtors' present use of the property as a working farm. The Debtors' expert, Raleigh Chesley ("Chesley"), agreed that if Parcel 1 were sold, it would likely be purchased for that purpose.

Blanchard appraised Parcel 1 in 1990 for $140,000. His current appraisal is $20,000 higher based on a change in highest and best use from that of a working farm to its anticipated use as a hobby farm.

The Debtors assert that Blanchard's standard for evaluating Parcel 1 is inappropriate; that the appraisal of the property must be based upon the Debtors' current and prospective use of the property.

■ We are persuaded that the Debtors' current and prospective use is the correct basis for the appraisal in determining the amount of the lender's secured claim. 3 *Collier on Bankruptcy*, ¶ 506.04[2], at 506–27 (15th Ed.1991); *In re Anderson*, 88 B.R. 877, 885 (Bankr.N.D.Ind.1988); *In re Foster*, 79 B.R. 906, 908 (Bankr.D.Mont.1987). Parcel 1 should therefore be valued as a full-time farm. This does not mean that Blanchard's appraisal is to be totally disregarded. In addition to Blanchard's market approach based on a "hobby farm" use, Blanchard also applied the income and cost approaches to determine value which are not affected by the proposed "hobby farm" use. In considering all of the evidence on value, the ultimate valuation should be based on the fair market value considering the use for which the property is designed and intended. *See Speck v. United States*, 104 B.R. 1021 (D.S.D.1989).

*II. Costs of Sale*

■ The Debtors assert that the value of FmHA's security interest should be reduced by the hypothetical costs of sale which would be incurred if the property were being sold. The purpose of the valuation in this case is to determine the amount of FmHA's security interest in order that the Debtors may propose a plan under which they can continue to use the property in their farming operation. Thus, a sale is not contemplated and the hypothetical costs which the Debtors ask the Court to consider will never actually be incurred.

There is a conflict among the Courts which have considered whether the debtor should be able to deduct costs of sale when the debtor contemplates retention and use of the property.

Those which would allow the reduction focus on the first sentence of 11 U.S.C.

§ 506(a) which provides that the creditor's claim is secured "to the extent of the value of such creditor's interest." *See e.g. In re Overholt,* 125 B.R. 202 (S.D.Ohio 1990); *In re Felten,* 95 B.R. 629 (Bankr.N.D.Iowa 1988); *In re Claeys,* 81 B.R. 985 (Bankr.D.N.D. 1987). Other courts have espoused what we are persuaded is the better view, focusing on the factors in the second sentence of § 506(a), "the purpose of the valuation and ... the proposed disposition or use of such property." 11 U.S.C. § 506(a). Where the debtor intends to keep the property and use it in the debtor's continuing operations, a reduction in value for the hypothetical costs of sale is inappropriate. *See e.g. In re Coker,* 973 F.2d 258 (4th Cir.1992); *In re Good,* 151 B.R. 445 (Bankr.N.D.Ohio 1993); *In re Usry,* 106 B.R. 759 (Bankr.M.D.GA.1989).

### III. After–Acquired Property

The Debtors assert that the FmHA's security interest does not extend to after-acquired equipment or other property as FmHA's financing statement fails to mention after-acquired property. Resolution of this issue has little impact on the Debtors. If the FmHA does not have a lien on the after-acquired property, then Farm Credit has a security interest in that property.

The security agreements between the Debtors and the FmHA provide for a security interest in crops and in equipment and inventory "now owned or hereafter acquired by Debtor, together with all replacements, substitutions, additions, and accessions thereto." The financing statement filed by the FmHA provides for an interest in "the following types of collateral, including proceeds and product, thereof: (a) Crops, livestock, supplies, other farm products and farm and other equipment." The financing statement does not mention after-acquired property.

■ The purpose of requiring the filing of financing statements is to give potential future creditors sufficient notice of the existence of a security interest in a particular type of property so that further inquiry can be made about the property subject to the security interest. 13 Pa.Cons.Stat.Ann. § 9402, *comment,* p. 343–44 (Purdon, 1984); *In re McGovern Auto Specialty, Inc.,* 51 B.R.

511 (Bankr.E.D.Pa.1985); *Heights v. Citizens National Bank,* 463 Pa. 48, 342 A.2d 738 (1975).

In the case of *In re Young,* 42 B.R. 939 (Bankr.E.D.Pa.1984), the Court held that specific reference to after-acquired property is required in both the security agreement and financing statement in order for a creditor to have a perfected security interest in after-acquired property. In a later case, *In re Engle,* 73 B.R. 870 (Bankr.E.D.Pa.1987), that same Court in a reversal of its prior ruling, determined that "the absence of an after-acquired provision in the financing statement does not, by itself, preclude a perfected· interest in after-acquired property." *Engle* was reversed by the District Court on other grounds. *In re Engle,* 93 B.R. 58 (E.D.Pa.1987). The District Court found that the security agreement involved was ambiguous and therefore, it did not address the sufficiency of the financing statement. *Id.* at 59–60.

■ In *In re Taylor,* 45 B.R. 643 (Bankr. M.D.Pa.1985), the Court relied on the comments to § 9204 of the Uniform Commercial Code, 13 Pa.Cons.Stat.Ann. § 9204, *comment,* p. 208–09 (Purdon, 1984) in concluding "that the legislature did not intend that an after-acquired provision be necessary in the financing statement to have a validly perfected security in property of the 'type' set forth in the financing statement." The comment to § 9204 clearly provides that "[t]here is no need to refer to after-acquired property or future advances in the financing statement." 13 Pa.Cons.Stat.Ann. § 9204, *comment,* p. 209 (Purdon, 1984). The comments are given substantial weight in interpreting the legislative intent of the Uniform Commercial Code ("UCC"). *Taylor,* 45 B.R. at 644 (and cases cited therein). Cases decided under similar UCC enactments in other jurisdictions support a finding that a specific reference to after-acquired property is not required in the financing statements. *First Bank v. Eastern Livestock Co.,* 837 F.Supp. 792 (S.D.Miss. 1993); *In re Fibre Glass Boat Corp.,* 324 F.Supp. 1054 (S.D.Fla.) *aff'd* 448 F.2d 781 (5th Cir.1971); *Manufacturers and Traders*

*Trust Co. v. Brown,* 75 B.R. 704 (W.D.N.Y. 1987).

■ We conclude that the financing statements filed by the FmHA were sufficient to place later creditors on notice of the FmHA's security interest in the "type" of property owned by the Debtors and that the lack of an after-acquired property clause in the financing statements does not preclude the FmHA from having a perfected security interest in the Debtors' after-acquired property.

### IV. Titled Vehicles

Included as part of Blanchard's equipment appraisal are values for titled vehicles. The FmHA has provided the Court with copies of the certificates of title for three vehicles which the FmHA asserts are "necessary to establish that the FmHA holds a first lien in the vehicles."

■ The Debtors have provided copies of the titles for seven other vehicles, six of which have no notation of lien in favor of the FmHA and one on which the FmHA has released its lien.

The applicable statutes require a notation of lien on the certificate of title. Section 9302 of the UCC, 13 Pa.Cons.Stat.Ann. § 9302 (Purdon, 1984), directs us to the Motor Vehicle Code for controlling authority. In Pennsylvania, a security interest in a vehicle is not perfected until the Department of Transportation receives an application for a certificate of title with information regarding the security interest. 75 Pa.Cons.Stat.Ann. § 1132 (Purdon Supp.1993); *see also In re Tressler,* 771 F.2d 791 (3d Cir.1985); *In re Ambrose,* 148 B.R. 244 (Bankr.W.D.Pa.1992). Where there is no evidence that the FmHA made application for a certificate of title with its lien noted thereon, the FmHA does not have a security interest in the vehicles.

### V. Crops Fed to Cattle

■ The Debtors used a portion of the 1992 hay crop which was produced on land listed in the FmHA's financing statement and upon which the FmHA had a security interest for cattle feed. The Debtors harvested a total of 549 tons of hay in 1992 and sold 449 tons. The remaining 100 tons was used as cattle feed. The Debtors assert that the FmHA's security interest in the hay used

for cattle feed terminated when it was fed to the cattle.

We have previously addressed that issue and concluded "that a security interest in feed or grain does not continue into cattle which consume the feed or the proceeds of such cattle upon their sale." *In re McDougall,* 60 B.R. 635 (Bankr.W.D.Pa.1986).

There is an additional consideration in this case. The FmHA's security interest extends to cattle. Feeding of the cattle is necessary for their survival, and presumably, increases their value. In determining the value of the FmHA's collateral, it would be incorrect to count both the increased value of the cattle and the value of the hay which the cattle have eaten.

### VI. Costs of Repair and Maintenance

■ The parties agree that the costs of maintaining, harvesting and marketing the 1992 crops can be subtracted from the value of the 1992 crop for the purpose of determining the value of the FmHA's security interest. The FmHA objects to the amount of the deduction requested by the Debtors. The FmHA objects to the amount of the deduction requested by the Debtors. The FmHA asserts that the repairs and maintenance to the vehicles and equipment is not exclusively attributable to the 1992 crop, but will also provide future benefit to the Debtors.

The fact that the repairs made in connection with the harvesting of the 1992 crop will permit the equipment to be run in 1993 should not detract from the applicability of the expenses to the 1992 crop. The Debtors' conduct an ongoing farm operation which requires constant expenditures for repairs and maintenance. If we were to follow the FmHA's reasoning, a portion of the expenditures for repairs in 1991 would apply to the 1992 crop. The possible future benefit from the 1992 repairs and maintenance does not detract from their applicability to the harvesting of the 1992 crop.

Further, the FmHA has a security interest in most of the equipment. To the extent that the repairs and maintenance are for that equipment, the FmHA is benefitted by an increase in the value of the equipment.

## VII.  Factual Determination of Value

### A.  Real Estate

#### 1.  Parcel 1

Parcel 1 includes the Debtors' residence and the 92 acres of land upon which the residence is located.  The Debtors assert that the value is $120,000 less costs of sale of $12,000.  The FmHA asserts that the value is $150,000.  Both parties base their asserted values upon the conflicting testimony of their respective experts.

Blanchard, FmHA's expert, used three approaches to valuation—the market approach, the income approach, and the cost approach. The value which he determined under each approach was similar, approximately $160,-000.  Blanchard determined that the property was built in 1900 with an addition in 1976; that the house was in medium condition with an older roof and that it needed minor upkeep.  Mrs. Brace stated that Blanchard was never in the home.  Chesley, the Debtors' expert, also states that he used the three approaches to value.  Chesley testified that the property was an older farm house which is "cut up" with additions; that the roof needs to be replaced and that the property needed a lot of repair.

Blanchard had previously appraised the property for $140,000.  He testified that the increase in value was due to a change in the highest and best use, from that of an operational farm to that of a country home used as a residence for a professional person.  The comparables Blanchard used were properties with recently-built homes with substantially less land and in some cases, no cropland at all.  Chesley based his appraisal on comparables which involved farms with acreage, which we find more accurately reflects the value of the Debtors' property.  Chesley previously appraised the property at $127,000 and has presently reduced the value to $120,-000 due to the lack of maintenance.

Blanchard, under the income approach, acknowledges that minor changes in the capitalization rate can create a significant change in value and that if he used the capitalization rate of a certain comparable upon which he relied, the indicated value of the property would be reduced by $10,000.

We think that Chesley's comparables more accurately reflect the value of the property and that Chesley, having viewed the interior of the property, is more familiar with its attributes.  We do not think that the lack of maintenance would have significantly changed the value over the period of one year, the length of time between Chesley's initial appraisal and the current appraisal. Further, Chesley bases his appraisal on an immediate cash sale and in some cases, relied on comparables sold at auction.  The Debtors plan to retain the property for continued use as a farm operation.  Therefore, the fair market value, using a reasonable method of sale, is appropriate.  We think that this warrants an upward adjustment in Chesley's value.  Accordingly, we determine that the value of Parcel 1 is between $130,000–$135,000 and since we must pick an exact number, we find that the value is $132,500.  As we have previously determined, there is no reduction for the hypothetical costs of sale.

#### 2.  Parcel 2

Parcel 2 is located separately from the Debtors' residence.  This parcel contains 90 acres with approximately 50 acres of tillable land.  Built on the property is a barn, a quonset and butler grain bins.  Blanchard testified that the property was in medium condition.  Chesley testified that the land and buildings were not in the best of shape; that the barn was worthless, the quonset needed repairs, but that the grain bins were in nice shape.  Blanchard has arrived at a value of $129,000, while Chesley believes the value is $110,000.

In arriving at a conclusion, Blanchard considered the parcel's use for growing potatoes. Blanchard considered comparable properties in arriving at a value of $127,656 using the market approach.  The market approach rendered values of between $121,000–141,000, after deducting $18,000 for the value of the gravel pit which is considered separately. The highest values of the comparables considered were for properties with land of a better quality which is suitable for potato farming.

In utilizing the income approach, Blanchard arrived at a value of $151,180. Blanchard calculated the estimated income using a rental figure of $75 per acre for the land, $5,000 rental for the bins and gas income of $3,090. After a deduction for expenses, Blanchard used a capitalization rate of 4.24%, equivalent to that of a nearby farm used for growing potatoes. At the hearing, Blanchard learned that the gas income of $3,090 included income from wells which are not on the Debtors' property and that the actual income from gas wells is only $1,650 per year. Blanchard subsequently revised his estimate of value based on the income approach to $119,100, but Blanchard states that he was not aware of the gravel income and that the gravel income would more than offset the reduced amount of gas income. That analysis is incorrect. The gravel income does not come from this parcel but rather a completely separate parcel. Blanchard had initially valued Parcel 2 at $132,000 but in view of the reduction in income, reduced his estimate of value to $129,000.

Blanchard also used the cost approach, essentially using the land values derived from the other two approaches and adding a depreciated value for the buildings on the property to arrive at a value of $149,100.

The FmHA asserts that the income approach should be given less weight because it varied from the other two approaches by more than 10%. We reject the FmHA's invitation to ignore the income approach. One reason for doing the income approach is to determine whether the valuations otherwise derived are accurate. When one of the valuation approaches differs greatly from the others, it alerts the appraiser to take a closer look.

Blanchard's appraisal was based upon the use of the property for growing potatoes. Mrs. Brace testified that the property is not suitable for growing potatoes—that the property is too hilly and erosion-prone and that it is economically unfeasible to use the property for growing potatoes. In addition, the USDA Soil Conservation Service restricts the use of the property from growing potatoes.

Blanchard used a rental value of $75 per acre in arriving at a value. Chesley also agreed that a $75 figure was appropriate. We heard from two other witnesses who are farmers in the area who rent substantial amounts of land for farming purposes. One of those witnesses, James Koolah, testified that he is familiar with the property and that he rents 210 acres located all around the Debtors' property. He testified that he rents, for $25, soil which is identical to the soil on this property; that it would be impossible to pay $75 and make a profit; and that the terrain of this property would prohibit potato farming.

Another area farmer, Blake Holliday, testified that he rents about 400 acres. Mr. Holliday was familiar with Debtors' property and stated that this parcel was comparable with his rentals, except that he does not farm hilly ground. Mr. Holliday's rent payments range from $0 to $40 with an average of $28 per acre. Mr. Holliday also opined that this parcel was not suitable for potatoes.

Chesley relied on comparable sales which he supported using the capitalization approach. While Chesley did not go into as much detail in arriving at a value for this property, we believe that his estimated value of $110,000 reflects the actual value. Accordingly, we find that the value of Parcel 2 is $110,000.

### 3. Gravel Pit

The difference in values prescribed by both appraisers is insignificant. Chesley valued this property at $20,000 in 1991 and valued it at $16,000 a year later. Chesley attributes the reduction to depletion of gravel and stricter reclamation requirements. Blanchard appraises the property at $18,000. We do not think that any significant depletion occurred in one year and we are not directed to any changes in the reclamation requirements. Accordingly, we find that the value of this property is $18,000. Both parties agree that a first mortgage interest in the amount of $12,253 is ahead of the FmHA interest in this property. The value available to support the FmHA's secured interest is $5,747.

#### 4. Equipment

Chesley, on behalf of the Debtors, appraises the equipment as having a value of $85,327 as opposed to Blanchard's appraisal of $101,800 on behalf of the FmHA. While there is some variance between the appraisals, the difference on most of the items is negligible. The major difference between the appraisers results from the estimates of value on four Ford Tractors. Chesley values the tractors at $15,390. Blanchard values them at $33,500. The difference in assigned values on the four tractors is $18,110. The entire difference is $16,483. We will therefore concentrate our efforts on the appraisals of the tractors.

Blanchard has appraised the tractors twice, the first time on October 20, 1990 and again in 1993. According to Blanchard's testimony, two of the tractors did not depreciate at all between the two appraisals and at least one of them actually increased in value. Blanchard testified that he obtained his values from two publications which listed similar items; that he took the book average; and that he had no idea of the condition of the equipment listed in the publications.

Chesley testified that he regularly sells this type of equipment. His valuations were based on the poor condition of these tractors which had been banged up and were in rough shape. Chesley testified that if an auction were held and even if these tractors were put in top shape, the fact that they had been used on a potato farm is a red flag which reduces the value.

We see faults with both appraisals. Blanchard relies solely on a book value without taking into consideration the condition of the equipment. Chesley uses an auction figure which may not represent the fair market value in a commercially reasonable sale, the appropriate standard where the debtor contemplates continued use of the equipment. Further, Chesley states that use on a potato farm is a red flag. However, the Debtors partly used the farm for growing potatoes until 1987 and have not grown potatoes since that time. While the tractors may have been used for potatoes at one time, they have not been used in such a manner for many years.

Accordingly, we fix the value of the four tractors at $25,000. We accept Chesley's valuation of the remaining equipment and thus find that the total value of the equipment is $94,937 ($85,327 − 15,390 + 25,000).

Our inquiry does not end there. We previously determined that the FmHA's interest does not extend to titled vehicles upon which the FmHA made no application to have a lien noted on the title. Chesley has assigned these vehicles a value of $20,715. The value of the FmHA's lien must be reduced by that amount.

In addition, an NH combine, valued at $18,000 by Chesley, has a first lien of $8,786 in favor of Ford Motor Credit Company which leaves an equity of $9,214 for the FmHA. This reduces the effective lien of the FmHA on equipment to $65,436 ($94,937 − 20,715 − 8,786).

#### 5. Cattle

Chesley testified that the Debtors' cattle were all in good shape and that their value is $10,300. Blanchard valued the cattle at $13,900. We were provided no explanation for the variance in the value between the appraisers. We fix the value of the cattle at $12,100.

#### 6. Crops

The FmHA does not contest the value of the crops as determined by the Debtors. The Debtors have determined that the value of the crops is $10,464.90, including those fed to cattle and a value of $8,860.07 for crops, excluding those fed to cattle. In arriving at those figures, the Debtors have deducted expenses which the Debtors assert were exclusively incurred for the 1992 crop. The FmHA objects to the reduction made by the Debtors for repairs and maintenance. The FmHA asserts that the repairs and maintenance are not specifically associated with this crop and will benefit the Debtors in years to come. We previously addressed this issue and have determined that the expense is appropriately charged against the FmHA's collateral.

We have also addressed the FmHA's assertion that its security interest includes the

value of crops used as feed and found that it does not.

Accordingly, we find that the value of the Debtors' crops subject to the FmHA security interest is $8,860.

### VIII. Conclusion

The following is a summary of the value of the FmHA's collateral in accordance with our determinations. The value of all of the Debtors' property is greater because this summary excludes items on which the FmHA does not have a lien or to which prior security interests apply:

| | |
|---|---|
| Parcel 1 (Residence farm) | $132,500 |
| Parcel 2 (Farm land) | 110,000 |
| Gravel pit | 5,747 |
| Equipment | 65,436 |
| Cattle | 12,100 |
| Crops | 8,860 |
| Value of FmHA's collateral | $334,643 |

The claim of the FmHA is therefore secured to the extent of $334,643 and unsecured as to the balance of its claim. The claim of Farm Credit is totally unsecured.

Having completed this tortuous exercise, we find additional support for our final conclusion in the testimony of Barry E. Miller, the County Supervisor for the FmHA. During the course of the Debtors' loans with the FmHA, their loan accounts were serviced under the FmHA's Debt and Loan Restructuring System ("DALRS"). As stated in Mr. Miller's Affidavit:

> DALRS is a computerized decision support tool. The computer assists FmHA loan officers in making a decision. The DALRS tool is used to meet Farmers Home Administrations objectives which is to provide supervised credit to borrowers in financial difficultly (sic) in a manner that will assure the maximum opportunity to the borrowers recovery, and at the same time get the best net recovery for the government. In this particular case, the Braces were delinquent in their payments and were having financial difficulties. The DALRS tool was used to see what services FmHA had available to assist in resolving the problem, if possible. In order for the DALRS tool to consider all servicing options available, (especially debt writedown

and buyout at net recovery value), an appraisal of the security is necessary to determine its market value. The Braces have been serviced under the DALRS program on two separate occasions, but generated three approved DALRS reports. On the first occasion, the borrowers received debt writedown in the amount of $164,363.87. Debt writedown is where a borrowers debt is reduced by an amount that will result in a feasible plan of operation. On the second occasion, the borrowers were eligible to buy out at the net recovery value of $298,035.00, and then subsequently at $200,318.00. Buyout at net recovery value is the amount the government would receive from the involuntary liquidation of the collateral servicing the FmHA debt. Buy out at net recovery value is not the value that would be received from a normal sale of security for fair market value; but rather net recovery is the value that would recieved (sic) as a result of forced liquidation taking into consideration costs incurred in a forced liquidation.

The final DALRS report which the FmHA approved for the Debtors was approved on June 5, 1991. On that report, the FmHA found the total market value of its security to be $343,412. As we have previously stated, where a debtor is reorganizing and will continue to own and use the equipment, we think fair market value is the appropriate measure of the value of the collateral. FmHA's assessment of $343,412 represents only a 2.6% difference from our conclusion.

An appropriate order will be entered.

### ORDER

This 25th day of January, 1994, in accordance with the accompanying OPINION, it shall be, and hereby is, ORDERED as follows:

1. The claim of the United States of America, Farmers Home Administration is secured to the extent of $334,643 and the balance of its claim is unsecured.

2. The claim of Meadville Farm Credit, ACA, is unsecured in total.